Clyde SMITH, Plaintiff,

v.

SUPERIOR CASING CREWS, Defendant.

Civ. A. No. 68–259.

United States District Court
E. D. Louisiana,
New Orleans Division.

April 25, 1969.
As corrected June 16, 1969.

**727**

Michael X. St. Martin, Philip E. Henderson, Houma, La., for plaintiffs*.

H. Minor Pipes, Houma, La., Andrew Partee, Jr., New Orleans, La., for defendant.

RUBIN, District Judge:

The plaintiffs in this action under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201–19, seek to recover unpaid minimum wages and overtime compensation from their former employer, together with liquidated damages and attorney's fees under Section 216 of the Act. 29 U.S.C. § 216.

All of the plaintiffs were members of casing crews. Casing crews provide a specialized service at certain stages of drilling an oil well. They install large pipe, or casing, in a portion of the drill hole to provide support for that part of the hole. A casing crew normally consists of five men, all of whom work as a team, without relief by any other crew, until their job is completed.

Usually, the geologist employed by the well-owner determines in advance that the subterranean structure in which the well is being drilled is of such a nature that casing will be required when drilling reaches a certain depth. The casing crew is ordered to report before this depth is expected to be attained. The driller continues operations with his usual crew. However, when the required depth is reached, the casing crew installs, or "runs," the casing.

Part of the work involved in this suit was performed on offshore rigs and on rigs located on inland waters ("water jobs"). The remainder was performed on land rigs ("land jobs"). The defendant, Superior Casing Crews ("Superior"), would be notified by a customer that a crew would be needed at a specified location at a particular time. The pusher, or foreman, of each crew would pick up each member of his crew in a company car at the member's home and provide transportation either to the job site (in the case of land jobs), or to the dock (in the case of water jobs). The equipment to be used on the job would be transported by company truck to the job site or dock where it would be unloaded by the individual crew members. Occasionally the crew members loaded the equipment onto boats or assisted in the loading. When the job site was on water, the crew would ride a boat to the job location.

Some of the rigs were located sixty miles offshore. On some trips to offshore rigs, stops were made at several well sites. Therefore, in some instances the amount of boat time was substantial.

After arriving at the location, whether on land or water, the crew normally was required to wait until it was time to run casing. When they were summoned to the location sufficiently in advance of the time when casing would be needed, the crew usually had a meal before starting work because the food available at the drilling site was plentiful, good, and inexpensive. But on some occasions they had time only for coffee before commencing work. During the waiting period, the crew members checked and cleaned equipment and engaged in rigging up activities.

* The present case was consolidated with 39 other cases for the purpose of trial. The captions in those other cases have been omitted to reduce clerical work but this opinion applies to all of the consolidated matters.

When the well reached the scheduled depth for installing casing, the crew ran the casing, removed Superior's equipment, and returned by boat to the dock or by auto home.

During the period involved in this suit, Superior charged its customers $5.60 per hour per man for time spent in travel to and from wells located on water ("boat time") and for time spent waiting to run casing ("waiting time"). Superior charged for running the casing on the basis of the number of feet of casing installed and the size of the casing. If its men were required to do other work, such as loading or unloading barges, it billed for this as "other work."

## THE EMPLOYMENT AGREEMENT

There is irreconciliable conflict between the testimony of the plaintiffs' witnesses and that of the defendant's witnesses with respect to whether Superior's employees were paid for overtime work at the time and one half rate required by the FLSA. 29 U.S.C. § 207(a)(1). The plaintiffs testified that their agreement with Superior was that they were to be paid for running casing according to a schedule, with their pay depending upon the size of the casing and the number of feet of casing run; they were to be paid the minimum hourly rate fixed by federal law for each hour of boat time and waiting time; and they were, in addition, to be paid an increased hourly rate for time spent in work classified as "other work." They testified that they were paid in accordance with the agreement and that they were not paid time and one half, that is, overtime pay, for any work.

Superior's witnesses testified that, while the employees were paid for running casing and "other work" in the manner described in the plaintiffs' testimony, the agreement, as well as the custom was, that employees were not to be paid at all for boat time, and were to be paid for only $^{13}\!/_{24}$ of the waiting time. The payment for $^{13}\!/_{24}$ of waiting time was arrived at on the supposition that, if an employee were waiting 24 hours, he would spend 8 hours sleeping and 3 hours eating meals. When the waiting time was two hours or less, no deduction was made. If it was more than 2 hours but less than 5 hours, the "girl in the office" was permitted to decide (apparently according to her own unfettered judgment) whether or not to deduct eleven twenty-fourths. Then a calculation was made of the time involved in "other work" and in running casing; those hours, added to the number of compensated hours in each week, (i. e., $^{13}\!/_{24}$ of the waiting time but none of the boat time) were tallied. Time and a half was paid for hours in excess of forty in any work week. The hourly rate of pay for each man, according to this testimony, varied greatly each week, because the hourly rate was a "forced figure." [1] The hourly rate would not be known until the employee's total work for the week was done.

A few of the men occasionally worked in Superior's shop. They testified that they were not paid for this work, known as "shop time." Superior contends that all of the men worked in the shop frequently and were paid shop time whenever they worked it. The plaintiffs contend that they did not actually do any such work on most occasions, but that "shop time," as shown on the payroll, was usually an artificial figure inserted to make the overtime computations appear correct.****

\*　　\*　　\*　　\*

▮ \* \* \* \* It is difficult to credit any version of the facts that would assume that the employees agreed that they were not to be paid at all for time that their employer billed to his customers at $5.60 an hour. \* \* \* \* Superior's principal witness was its

---

[1]. See, for example, the rates of pay in the "Rate per hour" column on the payroll summaries due November 24, 1966 and December 1, 1966.

\****The four asterisks indicate the deletion of references to confidential information, nondisclosure of which was requested by the parties.

'President, Mr. Matherne, and I place little credence on his testimony because of his demeanor and conduct as a witness and various conflicts and inconsistencies in his testimony. Mr. Matherne had previously been involved in an FLSA injunction proceeding. He was both sufficiently educated and informed to know the legal requirements with respect to keeping accurate records. * * * * Therefore, I find that the employment agreement was, as the plaintiffs testified, that employees were to be paid at the prevailing minimum wage specified in the FLSA for all boat time and waiting time, that they were *not* to be paid for overtime at time and one half[2] * * * * *

## DEDUCTIONS FOR SLEEPING TIME AND EATING

In an Interpretative Bulletin, 29 C.F.R. § 785.22, the Administrator has set forth his position on enforcement of the Act with respect to deductions from compensated hours for sleeping time and lunch periods when an employee is required to be on duty for 24 hours or more. The Administrator's position is:

"[T]he employer and the employee may agree to exclude bona fide meal periods and a bona fide regularly scheduled sleeping period of not more than 8 hours from hours worked, provided adequate sleeping facilities are furnished by the employer and the employee can usually enjoy an uninterrupted night's sleep. If [the] sleeping period is of more than 8 hours, only 8 hours will be credited. Where no expressed or implied agreement to the contrary is present, the 8 hours of sleeping time and lunch periods constitute hours worked."

"There is no statutory provision as to what, if any deference courts should pay to the Administrator's conclusions," the Supreme Court said in Skidmore v. Swift & Co., 1944, 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124. Then it observed:

"And, while we have given them notice, we have had no occasion to try to prescribe their influence. The rulings of this Administrator are not reached as a result of hearing adversary proceedings in which he finds facts from evidence and reaches conclusions of law from findings of fact. They are not, of course, conclusive, even in the cases with which they directly deal, much less in those to which they apply only by analogy. They do not constitute an interpretation of the Act or a standard for judging factual situations which binds a district court's processes, as an authoritative pronouncement of a higher court might do. But the Administrator's policies are made in pursuance of official duty, based upon more specialized experience and broader investigations and information than is likely to come to a judge in a particular case. They do determine the policy which will guide applications for enforcement by injunction on behalf of the Government. Good administration of the Act and good judicial administration alike require that the standards of public enforcement and those for determining private rights shall be at variance only where justified by very good reasons. The fact that the Administrator's policies and standards are not reached by trial in adversary form does not mean that they are not entitled to respect." 323 U.S. at 139–140, 65 S.Ct. at 164, 89 L.Ed. at 129.

Hence, continuing, the Court said:

"We consider that the rulings, interpretations and opinions of the Administrator under this Act, while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance. The weight

---

2. There are many scattered bits of corroboration. For example, the log book kept by one employee, Clyde Smith, notes increases in the FLSA minimum wage "10/22/65" as "Started giving 25 raise in W.T. W.T. B.T."

of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." 323 U.S. at 140, 65 S.Ct. at 164, 89 L.Ed. at 129.

The Administrator's interpretation is supported by the cases cited in the Bulletin: "Armour [& Co.] v. Wantock, 323 U.S. 126, [65 S.Ct. 165, 89 L.Ed. 118] (1944); Skidmore v. Swift & Co., 323 U.S. 134, [65 S.Ct. 161, 89 L.Ed. 124] (1944); General Electric Co. v. Porter, 208 F.2d 805 (C.A. 9, 1953), cert. denied 347 U.S. 951, 975, [74 S.Ct. 676, 98 L.Ed. 1097] (1954); Bowers v. Remington Rand, 64 F.Supp. 620 (S.D.Ill.1946), aff'd 159 F.2d 114 (C.A. 7, 1946), cert. denied 330 U.S. 843, [67 S.Ct. 1083, 91 L.Ed. 1288] (1947); Bell v. Porter, 159 F.2d 117 (C.A. 7, 1946), cert. denied 330 U.S. 813, [67 S.Ct. 1082, 91 L.Ed. 1269] (1947); Bridgeman v. Ford, Bacon & Davis, 161 F.2d 962 (C.A. 8, 1947); Rokey v. Day & Zimmerman, 157 F.2d 734, 736 (C.A. 8, 1946); McLaughlin v. Todd & Brown, Inc., 7 W.H.Cases 1014; 15 Labor Cases para. 64,606 (N.D.Ind. 1948); Campbell v. Jones & Laughlin, 70 F.Supp. 996 (W.D.Pa.1947)." *See also*, Wirtz v. Sullivan, 5 Cir. 1964, 326 F.2d 946; Ariens v. Olien Mathieson Chemicals Corp., 6 Cir. 1967, 382 F.2d 192; Rural Fire Protection Co. v. Hepp, 9 Cir. 1966, 366 F.2d 355; Wirtz v. Spencer, N.D.Miss.1963, 223 F.Supp. 692.

■ The testimony convinces me that there was no express agreement between Superior and its employees that Superior could deduct $1\frac{1}{24}$ of their waiting time. But, as the Interpretive Bulletin points out, the existence of an agreement to exclude sleeping time and meal time from pay time may be inferred from the actual practices of the employer and the employees. Here the employees were on call whenever they were on the rig: they were standing by waiting to go to work when needed. They were called to the rig only when it was expected that they would soon be needed. They had no regular sleeping period, and, indeed, could expect none. They were completely under Superior's direction whenever they were on the job site, even though they were permitted during periods when they were not needed to sleep or to eat a meal. See, *e. g.*, General Electric Co. v. Porter, 9 Cir. 1953, 208 F.2d 805; and Biggs v. Joshua Hendy Corp., 9 Cir. 1950, 183 F.2d 515, opinion supplemented, 187 F.2d 447. Customers paid Superior for all employee time spent on the job site, so both Superior and its customers must have considered this to be work time. Hence it appears to be proper to apply the Administrator's interpretation here. Accordingly, I find that there was no implied agreement by the employees that Superior could deduct $1\frac{1}{24}$ of their waiting time. But even if there had been such an agreement, there would be no legal basis for it. General Electric Co. v. Porter, *supra*; Biggs v. Joshua Hendy Corp., *supra*.

## LIABILITY FOR OVERTIME

■ The stubs on the payroll checks purported to account for overtime pay. The defendant urges that the employees acknowledged that this was correct when they cashed each check, else they would have protested. I credit the testimony that the plaintiffs accepted the checks because they were told that Superior had to have some way of manipulating its records so that the labor department would think that Superior was paying overtime; that the employees thought Superior had two sets of books, one for this purpose, and the other an accurate account.

Neither the employees' acceptance of their paychecks, nor their connivance in the employer's practices bars them from securing what is due them under the FLSA. Since the Fair Labor Standards Act was designed to implement a national policy, its purpose may not be frus-

trated by the joint actions of an employer and his employees. Jewell Ridge Coal Corp. v. Local No. 6167, United Mine Workers of America, D.Va.1944, 53 F.Supp. 935, cert. denied, 322 U.S. 756, 64 S.Ct. 1267, 88 L.Ed. 1585, reversed on other grounds, 145 F.2d 10, affirmed, 325 U.S. 161, 65 S.Ct. 1063, 89 L.Ed. 1534, rehearing denied, 325 U.S. 897, 65 S.Ct. 1550, 89 L.Ed. 2007; F. W. Stock & Sons, Inc. v. Thompson, 6 Cir. 1952, 194 F.2d 493; Johnson v. Dierks Lumber & Coal Co., 8 Cir. 1942, 130 F.2d 115; Walling v. Lippold, D.C.Neb.1947, 72 F.Supp. 339.

\* \* \* \*

█ █ The act requires the employer, not the employee, to keep accurate time and wage records. Fair Labor Standards Act, 29 U.S.C. § 211(c). The employer cannot escape liability by his own dereliction. "[A]n employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference. The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence. If the employer fails to produce such evidence, the court may then award damages to the employee \* \* \*." Anderson v. Mt. Clemens Pottery Co., 1946, 328 U.S. 680, 687–688, 66 S.Ct. 1187, 1192, 90 L.Ed. 1515, 1523. See also, Mitchell v. Riley, 5 Cir. 1961, 296 F.2d 614; Wirtz v. Durham Sandwich Company, 4 Cir. 1966, 367 F.2d 810; Rural Fire Protection Company v. Hepp, 9 Cir. 1966, 366 F.2d 355.

█ "[T]here can be no serious question about coverage and hence a liability on the employer for *some* amount," as the Court said in Mitchell v. Mitchell Truck Line, Inc., 5 Cir. 1961, 286 F.2d 721, 724. See also, Mitchell v. Riley, *supra*. Here as in that case the only

uncertainty is the extent of the damage. Here, as there, it may be proper to refer that aspect of the case to a master.

## PORTAL-TO-PORTAL ACT

█ The Portal-to-Portal Act, 29 U.S.C. §§ 251–262, is inapplicable here by its own terms. Section 252(a) (1) provides that the employer need not compensate its employees, in the absence of "an express provision of a written or nonwritten contract," for "preliminary" or "postliminary" activities, such as traveling to and from the job location and dressing for work, which are of a different nature than the activities that constitute the regular employment. 29 U.S.C. § 252(a) (1). With respect to "boat time" this section is inapplicable because the parties had agreed that the employees were to be paid for "boat time." *Cf.* P–H Wage & Hour Serv. ¶ 13,866 (Current Matter) (boat ride to job site not time worked). With respect to waiting time there was an agreement to compensate the employees, and the Portal-to-Portal Act does not apply for the additional reason that waiting was not preliminary but part of the regular employment. The employees here were "engaged to wait." Skidmore v. Swift & Co., 1944, 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124. *See also,* Interpretive Bulletin, 29 C.F.R. § 785.14. Waiting was essential to the proper performance of their job duties, for they had to set up their equipment and wait for the time to begin running casing. In addition their employer billed his customers for this time. It was clearly "time worked" within the meaning of the FLSA.

## STATUTE OF LIMITATIONS

The Statute of Limitations for suits under the Fair Labor Standards Act is two years. 29 U.S.C.A. § 255(a). However, by P.L. 89–601, effective Feb. 1, 1967, a qualifying clause was added: "[E]xcept that a cause of action arising out of a willful violation may be com-

menced within three years after the cause of action accrued."

Since the violation in this case was willful, the three year period would apply unless it is inapplicable to causes of action that arose before its passage.

■ It is well established that a statute of limitations enlarging the time in which an action may be brought is not retroactive legislation and does not impair any vested right. See, for example, the landmark case of Campbell v. Holt, 1885, 115 U.S. 620, 6 S.Ct. 209, 29 L.Ed. 483. See also, Wirtz v. Tooley-Myron Corporation, 47 Labor Cases 31,411 (U.S. D.C.Florida 1963) and Goldberg v. M. & K. Manufacturing Co., Inc., 44 Labor Cases 31,246 (U.S.D.C.Colorado 1962), in which the courts were called upon to decide a similar question with respect to their jurisdiction to award back wages that had accrued at a time when there was no authority to award back wages in an injunction suit, i. e. prior to the 1961 amendments, which enlarged the court's jurisdiction to award back wages.

■ The correct conclusion appears to be the one reached by the United States District Court for the Southern District of Florida, in Wirtz v. Handy, 279 F.Supp. 264, that the three year statute is applicable to a claim that accrued before it was adopted.

## LIQUIDATED DAMAGES AND ATTORNEY'S FEES

■ Clearly Superior was not in good faith. 29 U.S.C. § 260. Therefore liquidated damages will be allowed under Section 216(b) of the Act, 29 U.S.C.A. § 216(b), together with attorney's fees and costs. The court will consider evidence on what would be a reasonable attorney's fee.

This opinion will serve in lieu of findings of fact and conclusions of law. Unless a motion is made for an earlier entry of judgment, judgment will not be entered until the amounts due the various plaintiffs have been determined.