C.M. ROUSSEAU, Jr.

v.

**TELEDYNE MOVIBLE OFFSHORE, INC.**

Civ. A. No. 83–2553.

United States District Court,
W.D. Louisiana,
Lafayette-Opelousas Division.

Oct. 18, 1985.

Wendell G. Lindsay, Jr., Lindsay & Marcel, Baton Rouge, La., for plaintiffs.

Greg Guidry, Onebane, Donohoe, Bernard, Torian, Diaz, McNamara & Abell, Lafayette, La., for defendants.

## OPINION

SHAW, District Judge.

Plaintiffs have filed this lawsuit under the Fair Labor Standards Act claiming entitlement to pay for all time not reasonably allocable to eating and sleeping and other personal time when they were off duty but not allowed to leave the barges that they worked on.

In addition to this claim, twenty-four of the original plaintiffs amended their complaint to add a second cause of action under the Fair Labor Standards Act. This cause of action alleges that Teledyne Movible Offshore, Inc., the defendant, laid off these particular plaintiffs on March 1, 1984 in retaliation for their filing of the lawsuit.

The trial was bifurcated, resulting in the claims for overtime being tried by the Judge while the retaliatory discharge claims were tried by a jury. The jury returned a verdict for the plaintiffs and the defendant has filed a motion for judgment notwithstanding the verdict or in the alternative a new trial.

Teledyne Movible Offshore, Inc. is a company engaged in the business of fully servicing the oil and gas industry offshore. Its construction department consists of two divisions, the fabrication yard at Amelia, Louisiana and the offshore division, the division of the company involved in this litigation. In the offshore division, the company owns three derrick barges.

The derrick barges are used to lift offshore structures from cargo barges and place them in position on the Gulf of Mexi-

co floor. They are also used to perform maintenance and repair work to fixed offshore structures, for fighting blowouts, for laying pipelines, and for engaging in other similar activities concerning fixed offshore structures. These derrick barges are not self-propelled and must be towed to offshore locations by tug boats.

All sixty-three plaintiffs in this matter were employed on defendant's derrick barges in connection with the barges' activities in offshore construction. Individual plaintiffs were engaged in various jobs on the derrick barges, including rigger foreman, rigger leaderman, rigger first class, crane operator, barge engineer, crane engineer, barge clerk, barge welder, and cook. All plaintiffs in this matter were paid an hourly rate, ranging from $7.25 per hour to $13.10 per hour.

The plaintiffs, at all relevant times, worked and work for defendant on a "hitch" basis, spending seven days working and living on defendant's derrick barges, and then spending seven days not working or living on defendant's derrick barges. The seven-day hitch begins on Thursday and ends on the following Thursday.

Defendant's seven-day "workweek" runs from midnight Wednesday to the midnight of the following Wednesday. The first 40 hours worked by the employee after he begins his hitch on Thursday are compensated at the regular hourly rate. All hours worked in excess of forty, between Thursday and midnight Wednesday, are compensated at a rate of one and one-half times the hourly rate. All time worked on the last Thursday of the hitch, since it is in a new workweek (and the employee's eighth day), is compensated at the regular hourly rate.

All plaintiffs, at all material times, were regularly assigned a daily schedule of hours within which to perform their various job functions. Prior to October 1, 1982, this regular daily schedule had always been twelve hours, regardless of whether the derrick barges were engaged in income-producing work or not, and whether or not they were docked. The one exception to the twelve-hour schedule was

that of the cook, whose normal daily schedule was fourteen hours. In October of 1982, in an effort to reduce costs because of drastically declining derrick barge utilization, representatives of defendant made a decision to reduce the derrick barge crews' regular daily work schedule when the derrick barges were on non-income-producing jobs. For most employees, this meant a reduction of the normal twelve-hour day to an eight-hour day. The cooks were reduced to a daily work schedule of nine and one-half hours. Except for the reduced daily schedule, there was absolutely no change in the company's pay system or policies. This reduced regular schedule on non-income-producing jobs was the practice from October 1, 1982 until the time of this lawsuit. At times when the derrick barges were "working" during this period, the employee reverted to a twelve and twelve schedule.

Sometimes, some derrick barge employees would work in excess of the daily schedule of hours. These times were normally when the barges were working and were normally limited to situations involving special jobs, such as rig moves, and in emergencies. All employees and plaintiffs were paid for all time worked in excess of the regular daily schedule. Employees considered this extra work desirable, because of increased earnings. The opportunities for the "extra time" became less and less as derrick barge utilization on income-producing jobs decreased. When the derrick barges are not working and are docked, the derrick barge employees seldom or never exceeded or exceed the regular daily schedule.

After the derrick barge employees are released from the day's active or physical labor, normally in the form of the daily regular schedule, they are completely released from all job duties and are free to engage in such activities as are available in the living quarters aboard the derrick barges, including watching television and VCR movies, listening to music, reading, eating, playing cards and similar games, sleeping, playing pingpong (on at least two of the three derrick barges), playing darts

(on at least two of the three derrick barges), fishing and generally attending to personal needs.

The living quarters of the derrick barges are similar to those found on many offshore drilling platforms, with recreation rooms, sleeping quarters and large galleys (in which derrick barge employees are allowed to have access to food and drink at any time during their off-duty periods).

The meal period taken during the employee's work shift is generally paid time. Off-duty meal periods are before and after the regular daily schedule, or after the day's work was completed, and employees could take generally as much time as they wanted to in eating these meals, depending on their own off-duty schedule, their own eating habits, and their own personal desires. Additionally, they could and did spend time snacking in their off-duty hours.

During their off-duty periods, each derrick barge employee was in fact subject to being called to work, if circumstances required. However, the experiences of individual plaintiffs demonstrate that they were either never, seldom, or infrequently called upon to perform job duties after they had been released from the day's work and before their next day's work began, particularly when the barges were docked and are not working. When the derrick barges are working, derrick barge employees are divided into two separate crews, with one working the day shift, and the other working the night shift. Most employees alternate or rotate the day and night shifts, working a day shift one seven-day shift, and the night shift the next seven-day hitch. When the barges are not working, however, all crew members typically work the day shift only, there being no need for two shifts.

Given normal business conditions, the normal location of the derrick barges was somewhere in the Gulf of Mexico. In 1977, the derrick barges had an 88% utilization rate for the year, meaning they were being utilized on income-producing jobs 88% of the time. Even when not working, the barges typically stayed in the Gulf. Subse-

quent years indicate the following utilization rates: In 1978, the utilization was 66%, in 1979 it was 51%, in 1980 it was 50%, in 1981 it was 32%, in 1982 it was 27%, and in 1983, the year that this lawsuit was filed, it was 14%.

As a result of these drastically declining percentages, the company was forced to make several cost-cutting changes. On January 30, 1980, it released the first tug boat that was under contract to tow the barges from location to location. On February 28, 1981, it released its other contract tug boat. Rather than keep the derrick barges in the Gulf of Mexico when not working, the company began to have them towed in to various sites. One such site is the construction departments' fabrication yard at Amelia, Louisiana. At other times, the derrick barges were tied up at various sea buoys in the Gulf, several miles offshore. Another site that the derrick barges were brought to when there were no income-producing jobs was inside Belle Passe. Belle Passe is the name for the place where the mouth of an inland waterway meets the Gulf of Mexico, on the coast of Louisiana between Leeville and Grand Isle, Louisiana, and near Fourchon City, Louisiana. When the derrick barges were "inside" Belle Passe, meaning in the inland navigable waterway, as opposed to the sea buoy one or two miles in the Gulf "outside" of the Passe, they would normally be anchored to one side of the navigable waterway. If the barge was located at Belle Passe in the navigable waterways, derrick barge employees would be bused from Amelia to the docks at Fourchon City, a two to two and one-half hour bus ride, and then transferred to the derrick barge by some form of marine transportation.

At all relevant times to this lawsuit, the Company has for numerous years had a policy of requiring derrick barge crews to reside on the derrick barges during the seven-day hitch, even at times when the derrick barge was docked at the Amelia, Louisiana fabrication yard. The reasons for the policy at dockside were several, including liability and safety concerns, a desire to avoid having to take disciplinary

action due to employees drinking and related rule violations, and the desire and need to remain in a "movable" status with a full crew aboard.

Plaintiffs testified that they did not like the company's no-leave policy when it was in effect, particularly after their income was reduced because their regular schedule of hours was reduced from twelve to eight hours after October of 1982 when the barges were docked at Amelia. Several complained about the pay reduction and about having to stay aboard, yet all continued working, with full knowledge that they would be paid only for time actually spent in productive job duties.

All plaintiffs were fully aware of and understood at all times, before and after the "cut" that they were to be paid only for those hours actually spent in physical or active labor, and that they were not to be paid for their off-duty time on the barges, except when called upon to perform extra work due to the exigencies of the job.

The Court will first address the claims for overtime. 29 U.S.C. § 207(a)(1) provides in pertinent part that no employer "shall employ any of his employees ... for a work week longer than forty hours unless such employee receives compensation for his employment in excess of [forty] hours at a rate not less than time and one-half the regular rate at which he is employed." Plaintiffs contend that they were "employed" by Teledyne during all of the time which they spent on the boat less a credit for eating, sleeping and personal time and therefore are entitled to overtime for all hours in excess of forty hours.

■ In order to determine that an employee is "employed" so as to activate the overtime payment requirement of the FLSA, it is not necessary that he be engaged in active labor. The Supreme Court has held that he is employed for purposes of the statute if he is engaged to wait for work. *Armour & Co. v. Wantock*, 323 U.S. 126, 65 S.Ct. 165, 89 L.Ed. 118 (1944); *Skidmore v. Swift & Co.*, 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944). Whether an employee is engaged to wait for work is a question of fact to be resolved by appropriate findings of the trial court. *Skidmore v. Swift & Co., supra; Walling v. Jacksonville Paper Co.*, 317 U.S. 564, 63 S.Ct. 332, 87 L.Ed. 460 (1942). As the Supreme Court stated in *Swift* this inquiry "involves scrutiny and construction of the agreements between the particular parties, appraisal of their practical construction of the working agreement by conduct, consideration of the nature of the service, and its relation to the waiting time, and all of the surrounding circumstances. Facts may show that the employee was engaged to wait, or they may show that he waited to be engaged. His compensation may cover both waiting and task, or only performance of the task itself. Living quarters may in some situations be furnished as a facility of the task and in another as part of its compensation. The law does not impose an arrangement upon the parties. It imposes upon the courts the task of finding what the arrangement was." 323 U.S. at 137, 65 S.Ct. at 163.

■ Considering the overall circumstances of this case, the Court is convinced that the plaintiffs were paid for all time that they reasonably expected to be paid for and that their claims for extra compensation must be rejected in their entirety. First, the Court finds that as stipulated by the parties, all plaintiffs were fully aware of and understood that they would be paid for only time spent in active or physical labor while on their seven days on, regardless of where the barge was located, and that even though the plaintiffs received a reduction in their take-home pay after their regular schedule of hours was cut on non-income-producing jobs, this understanding and their awareness of what time they would be paid for never changed. The Court finds that the arrangement between plaintiffs and the company was that they would be paid for their regular schedule of hours, whether it be 8 or 12, that they would be paid for all hours worked in excess of the regular schedule, and that this was to be the system whether the barge was offshore or docked.

The Fifth Circuit has addressed a similar situation in the case of *Allen v. Atlantic Richfield Co.*, 724 F.2d 1131 (5th Cir.1984). In *Allen*, twenty-two security guards at an Arco refinery brought suit alleging that Arco owed them additional overtime compensation for hours worked during a strike in 1980 by production employees. The guards normally worked three eight-hour shifts. During the strike, however, they worked twelve-hour on-duty shifts each day. They were paid for their on-duty shifts and for any actual work required during the off-duty twelve-hour period. Otherwise the guards were not paid for off-duty time when they were required to remain inside the refinery.

Evidence was introduced to show that this pay arrangement had been employed during two previous strikes in 1961 and 1969. Prior to each strike Arco met with the guard's union representatives. Agreements were put in writing that the guards would receive a higher than usual hourly rate for their first forty hours on duty each week and get time and a half that rate for any excess hours worked. These written agreements did not address the specific work hours. At a 1978 pre-strike meeting a company representative stated that the guards would not be paid for twenty-four hours a day during the strike.

Prior to the 1980 strike, at the pre-strike meeting, a company representative told the guard's union representative that the guards would receive the higher rate of pay only for the twelve-hour on-duty time. An employee of Arco who interviewed all guard applicants testified that he told numerous guards when he interviewed them of the strike arrangement whereby guards stayed at the plant full-time but were paid only for twelve hours. Also, evidence was introduced of discussions between the guards which indicated that they understood they were to remain in the refinery on a twenty-four hour basis and only be paid for twelve-hour on-duty shifts.

During the initial stages of the strike the guards were required to remain in the refinery on a twenty-four hour basis during both their twelve-hour on-duty shifts and their off-duty time. The guards were pro-vided sleeping quarters and food was provided at no cost around the clock. So long as they remained inside the refinery, the guards were free to utilize various recreational facilities which were provided. Interruptions to non-work time were infrequent and when they did occur the guards were paid for those interruptions.

The Fifth Circuit rejected the guards' argument that no evidence should have been admitted to show that past practice resulted in an agreement regarding what was noncompensable time since the employees could not agree to waive their rights under the Fair Labor Standards Act. The Court noted that the Supreme Court had made it clear in *Skidmore* that "an agreement between the parties is one factor that the fact finder properly should consider." 724 F.2d at 1136. The trial court had properly admitted evidence of an agreement between Arco and the plaintiff guards since the agreement was a circumstance to consider in determining whether the off-duty time in the plant was spent primarily for Arco's benefit.

After reviewing the record the Fifth Circuit concluded that there was sufficient evidence for the jury to conclude that an agreement did exist between the guards and Arco regarding time to be spent in the plant and affirmed the lower court decision that the guard's time spent on off-duty status was not work time.

█ In this case a similar agreement existed between the plaintiffs and Teledyne. As stated above, the evidence establishes that the plaintiffs were well aware of the fact that they would be paid only for their regular shift and any hours spent in active, physical labor and would not be paid for their off-duty time. The evidence also establishes that the plaintiffs were aware of the no-leave policy. The fact that there was no written agreement does not negate the existence of such agreement. *Skidmore, supra; Allen, supra; Rural Fire Protection Co. v. Hepp.*, 366 F.2d 355 (9th Cir.1966); *Bowers v. Remington Rand, Inc.*, 159 F.2d 114 (7th Cir.1946), *cert. de-*

*nied*, 330 U.S. 843, 67 S.Ct. 1083, 91 L.Ed. 1288 (1947).

The Court rejects plaintiff's argument that the plaintiffs negated the existence of an implied agreement by the fact that they complained about having to stay on the barge after their daily work schedules were reduced from twelve hours to eight hours at all times when the barges were not working. What we are concerned about here is the agreement as to what hours would be considered to be working hours and not whether the employees liked having to stay on the barges during their off hours. The plaintiffs knew about the no-leave policy and knew that they would not be paid during their off hours. By their conduct in continuing to work for defendant with full knowledge of the compensation system, as well as the "no-leave" rule, they impliedly consented to the continued working arrangement that had always existed between the parties, as part of their employment in the offshore industry. *Bowers v. Remington Rand, supra* (failure of several plaintiffs to sign written agreements confirming new pay system not controlling, since employees continued to work for employer after system was instituted.) *General Electric Co. v. Porter*, 208 F.2d 805 (9th Cir.1953) (court held, as a matter of law, that unilateral action of employer to pay firemen on a monthly salary basis rather than hourly wages with overtime, was impliedly accepted when the firemen reported to work and worked pursuant to the new schedule).

An argument that the plaintiffs' continued employment could not equal an implied consent because their only choice other than accepting the policy was to lose their jobs, is rejected by this Court. The Ninth Circuit addressed a similar claim of economic compulsion in the case of *Irwin v. Clark*, 400 F.2d 882 (6th Cir.1968). In that case the employees were on call twenty-four hours per day and seven days per week, but were not required to report at any given time, or remain for any stated period on the employer's premises. They were required to leave a telephone number where they could be called in the event that they were needed. Many of the plaintiffs frequently came to defendant's place of business between seven and eight o'clock a.m. voluntarily and without being called. Often if there was no work to be done at the time of reporting, they would wait for some period on the employer's premises on the chance that a work order would come in and that their services would be needed. While thus waiting, the plaintiffs performed no services for the employer, but the men who were on the premises and immediately available were the ones who received the most work. The plaintiffs claimed that they reported and waited as they did because of the likelihood of a better paycheck. From this they argued that the waiting time was not voluntary as a matter of law. In short, the plaintiff's position was, if there is any economic reward for waiting, the waiting must be compensated. The Sixth Circuit disagreed. The court cited *Skidmore* and stated: "[I]t is clear that economic compulsion is not a controlling factor." 400 F.2d at 884. The court noted that in *Skidmore* the firemen were required to stay in or close to the fire hall and presumably would not be hired were they unwilling to do so. The Supreme Court implied in its decision to remand the case for further proceedings that the district court might find as a matter of fact that "the waiting time (compelled as it was) was not working time." 400 F.2d at 884. Similarly, this Court recognizes that there was a degree of economic compulsion involved here but when considered as a factor along with the other factors, it does not negate the existence of an implied agreement that the employees would be paid only for their regular shift and any hours actually spent in physical labor. *See also, General Electric Co. v. Porter, supra.*

▪ The Court also rejects the notion argued by plaintiffs that the fact that defendant derived benefit from its no-leave policy classifies plaintiff's off-duty time as "hours worked". As recognized by the Fifth Circuit in *Allen v. Atlantic Richfield Company, supra*, the fact that the employer benefits from the employee being required to remain on the premises does not,

alone, answer the question of whether or not the actual time in question is spent predominantly for the employer's benefit. "There are many instances, however, in which time spent on the employer's premises is not compensable working time." 724 F.2d at 1136. Whether time is compensable working time depends "upon the degree to which the employee is free to engage in personal activities during periods of idleness when he is subject to call and the number of consecutive hours that the employee is subject to call, without being required to perform active work." 724 F.2d at 1137. The stipulated facts and evidence show that during their off-duty time on the barges, the plaintiffs were free to sleep, eat, watch television, watch VCR movies, play pingpong or cards, read, listen to music, etc. They seldom or never did any physical work after their regular shift ended and if they did they were paid for it pursuant to the agreement.

Another factor which leads to the conclusion that the waiting time was not predominantly for the employer's benefit is the fact that both the employer and the employee stood to gain if the employees were ready to go the minute a job came up. All parties concede that the economic situation at this time was very poor. When the barges were docked the employer was not producing any income. This case is distinguishable from *Smith v. Superior Casing Crews*, 299 F.Supp. 725 (E.D.La.1969). In *Smith* the court awarded the plaintiffs compensation for all time spent riding on boats to and from offshore rigs and all time spent waiting on the rigs until it was time to run casing. Among the distinguishing facts of this case was the fact that their employer billed his customers for all of this time. In the instant case the employer did not have any customers to bill while they were sitting at the dock. That is the precise reason why they were at the dock. Both the employer and the employees were waiting to be engaged. If and when a job came in, by being on the barges, the employees were assured of getting extra compensation. If they had been given the option to leave the employer's premises, it is arguable that many would

have stayed on the barges just as the employees in *Irwin v. Clark* waited outside the gate of their employer to insure that they would be the ones sent out on the jobs. *See also, Arthur v. K.D. Emrick Well Servicing Company*, 209 F.Supp. 491 (E.D.Okla.1962). The average employee lived more than one hundred miles from the fabrication yard and therefore would not have been able to respond within minutes if he was at home and a job came up.

Lastly, the Court notes that the employer could have done legally what the plaintiffs contend they did "illegally." Instead of paying premium wages to the employees during their shifts and nothing during their off-duty hours, Teledyne could have cut them all to minimum wage and paid them for twenty-four hours a day less a credit for sleeping and eating time. Given the economic situation at this time and the scarcity of jobs, it is arguable that the employees would have agreed to stay on under these conditions. Instead they agreed to be paid premium rates for the hours they worked and nothing for the hours when they did nothing. It would be inequitable to impose the plaintiffs' requested sanctions upon Teledyne under these circumstances.

In conclusion, the Court holds that there was an agreement between Teledyne and the plaintiffs that they would stay on the barges for twenty-four hours and be paid only for their regular shift and any hours actually spent in physical labor. This agreement along with the fact that the employees seldom, if ever, were called to work after their regular shift, they were free to eat, sleep and engage in various recreational activities, they benefited by being on the barges when a job did come up because they were able to insure themselves that they would earn overtime, and the fact that Teledyne could have accomplished the same result by paying the employees the minimum wage twenty-four hours a day less a credit for sleeping and eating time led this Court to conclude that the time spent waiting on the barges was not primarily for the employer's benefit. Although Teledyne did benefit from the

arrangement, so did the employees. This Court holds that the employees were not "engaged to wait."

We now reach the final chapter of this case. The plaintiffs' retaliatory discharge claims were tried to a jury which returned the following answers to the Court's interrogatories:

1. Did the filing of the lawsuit play any part in the employer's decision to discharge or lay off any plaintiffs?

Answer Yes or No: "Yes"

(Note: If you answered "No" to Question One, proceed no further. If you answered "Yes" to Question One, proceed to Question Two.)

2. Did the defendant have a legitimate non-discriminatory reason which played any part in the decision to discharge or lay off any plaintiffs?

Answer Yes or No: "No"

(Note: If you answered "No" to Question Two, skip Question Three and proceed to Question Four. If you answered "Yes" to Question Two, proceed to Question Three.)

3. Has any plaintiff proved by a preponderance of the evidence that a discriminatory reason more likely motivated the employer or that the employer's profferred explanation is unworthy of credence?

Answer Yes or No: ____

(Note: If you answered "No" to Question Three, proceed no further. If you answered "Yes" to Question Three, proceed to Question Four.)

4. Were all of the discharged or laid-off plaintiffs discriminated against by the defendant?

Answer Yes or No: "Yes"

(Note: If you answered "Yes" to Question Four, proceed no further. If you answered "No" to Question Four, proceed to Question Five.)

5. Check the name(s) of the plaintiff(s) whom you conclude have been discriminated against by the defendant.

____ Harry L. Bellard
____ Kenneth Breaux
____ Tommy L. Brown
____ William E. Chandler, Jr.
____ Keevin Comeaux
____ Jimmy R. Edison
____ John Jerry Deville
____ Layman E. Gillmore
____ Bruce A. Hebert
____ Michael S. Hebert
____ Lloyd A. Jones
____ Seaborn L. Lott

Defendant has filed a motion for judgment notwithstanding the verdict or in the alternative, a new trial. As grounds for the judgment notwithstanding the verdict the defendant points to interrogatory number two where the jury concluded that the defendant had no legitimate non-discriminatory reason that played any part in the layoff or discharge of the employees. As grounds for a new trial defendant urges this same reason and also alleges juror misconduct.

This Court notes that in order to grant a judgment notwithstanding the verdict, the Court must conclude that the evidence, together with all the inferences that can reasonably be drawn therefrom is so one-sided that reasonable men could not disagree on the verdict. *Coburn v. Pan American World Airways, Inc.,* 711 F.2d 339 (D.C. Cir.1983). After reviewing the evidence presented at trial this Court concludes that a judgment notwithstanding the verdict is proper and will be granted.

■ As agreed by the parties and the Court before the trial of this matter, the burden of proof in this action is the same as that in employment discrimination cases brought under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.,* and similar discrimination laws. The plaintiffs must prove by a preponderance of the evidence a prima facie case of discrimination. If plaintiff establishes a prima facie case of discrimination, the burden of *production* shifts to defendant to simply articulate a legitimate, non-discriminatory reason for their action. If defendant meets that burden, the plaintiff has the opportunity to prove by a preponderance of the evidence that the reasons offered by defendant are not the true rea-

sons, but are a pretext for discrimination. *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

■ The Court's first three interrogatories to the jury were based upon the above stated burden of proof. Although there was sufficient evidence to support the jury's conclusion in interrogatory number one, the Court concludes that no reasonable person could have concluded as the jury did in interrogatory number two. Throughout the trial, all parties conceded that due to the economic situation that existed on March 1, 1984 the defendant, Teledyne, had to take some action to reduce costs. Plaintiff Bud Rousseau admitted under oath on the stand that the company had to take some sort of "job action" in March of 1984 because of the obviously poor business conditions. Counsel for plaintiffs argued in opening and closing statements that the plaintiffs were not contending that defendant did not have a need and a right to reduce payroll costs because of the economy, but that what they were attacking was defendant's choice of the layoff over the PCP program.

Defendant introduced evidence which established that Teledyne Movible Offshore has suffered a steady decline in business for the last several years, and that during the last few months prior to the March 1, 1984 layoff, its derrick barge utilization in the offshore division of the construction department was at its lowest level in the history of the company. Testimony established that layoffs and the need for another layoff in the offshore division of its construction department was a topic of steady and repeated discussion between company officials long before any lawsuit was filed in October of 1983 and long before the layoff in March of 1984 took place. Due to a lack of work and poor economic conditions, the company had laid off hundreds of employees throughout the company, none of whom were suing the company for wage and hour violations at the time that the layoffs occurred. Specifically, Mr. Ned Travis testified that between 1980 and the end of 1984, 238 employees were laid off or terminated for lack of work in the drilling department; 112 employees were laid off or terminated for lack of work in the fabrication yard division of the construction department; and that nine employees were laid off or terminated for lack of work in other departments of the company. Of these over 400 employees who lost their jobs because of lack of work, only a small group of them were placed on the partial claims program offered by the Department of Employment Security for the state of Louisiana. These were employees employed in the fabrication yard, who, because of the nature of their land-based job and their own particular work schedules, were considered by defendant to be well-suited to participate in the program. The drilling department, the offshore division of the construction department, and other miscellaneous departments of the company did not participate in the PCP program.

The offshore division itself had previously conducted a layoff of derrick barge employees in early 1980, due to lack of work. The system for determining who would be selected for the layoff was by determining which job classifications were least critical for the company's manning of its derrick barges, which is the same system the company testified it utilized in choosing who would be laid off in the March, 1984 layoff litigated in this case.

In October of 1982 the company considered a layoff but Mr. James Stanley, Vice President of Construction, testified that the company preferred to keep as many people on as it could, with the hope that business would improve. Rather than lay off half of its workforce in the offshore division, the company chose to reduce the regular schedule of hours from twelve to eight on the days when the derrick barges were not working.

From October of 1982 through March of 1984, business did not improve and derrick barge utilization figures continued to decline, as shown in defendant's exhibits 1 and 20. Testimony revealed that throughout this time, Mr. Stanley and Mr. Theriot

repeatedly and continuously discussed the fact that a layoff was imminent.

As stated above the defendant had only a burden of production, not a burden of persuasion. Its duty was merely to produce evidence of a legitimate, non-discriminatory reason for the layoff. "The defendant need not persuade the court that it was actually motivated by the proffered reasons.... It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Texas Dept. of Comm. Affairs v. Burdine*, 450 U.S. at 254–55, 101 S.Ct. at 1094. The defendant met this burden. All of the evidence, as well as the contentions of both parties, convince the Court that the economic situation in the oil industry at the time of the layoff was such as to justify a decision to lay off employees in order to reduce costs. In light of the evidence, no reasonable juror could have concluded as the jury did in interrogatory number two.

Having decided that the defendant met its burden of production, and therefore, the jury's conclusion in interrogatory two was wrong, the Court must now decide whether the plaintiffs proved their case directly by a preponderance that a discriminatory reason more likely motivated the defendant or indirectly by a showing that the defendant's proffered explanation is unworthy of credence. *Texas Dept. of Comm. Affairs v. Brodine, supra.* The Court concludes that plaintiffs have failed to meet this burden.

Plaintiffs introduced evidence that when Mr. Theriot received a copy of the lawsuit, he posted it on the derrick barge bulletin boards immediately adjacent to a notice of an NLRB election which was underway at the time. Plaintiffs contend this was done so as to prominently display the names of those who brought the action.

Defendant claims its purpose was to talk to employees about the union and the lawsuit and their relationship to one another. Theriot wished to point out that the union's attorney, Mr. Wendell Lindsay, had also signed the lawsuit and to emphasize to employees that they had to separate the two and that one did not have to join the union in order to assert his rights under the wage and hour laws. Theriot also called a meeting for that purpose and explained the above items to employees. He answered questions from the floor, pointing out that he was not certain what impact the lawsuit would have on company business, indicating that a large judgment could impact company business, and advised employees that he thought they would probably have to file suit on their own if they wanted to collect any money if the company was found in violation of the Fair Labor Standards Act. He also told the employees that it was the right of every employee to assert their rights under the wage and hour law and that no one would be retaliated against by doing so, and that they did not need to join the union to have protection in asserting their rights under the wage and hour law. All of these communications by Mr. Theriot were corroborated and confirmed by plaintiffs who testified at trial.

The rest of plaintiffs' evidence merely attacks the defendant's business decision to lay off the employees as opposed to some other method of solving their financial problems, in particular the Partial Compensation Plan ("PCP").

Several weeks before the layoff, plaintiff Budd Rousseau approached Mr. Theriot with a proposal that instead of having a layoff the company could put the employees on the PCP program. This would have allowed the employees to work on a temporary basis, one week out of the month, and then draw unemployment compensation during some of the remaining weeks of the month. Mr. Theriot told Mr. Rousseau that he had already looked into it for the derrick barges in the previous year at the same time that the fabrication yard employees had been put on it (before the lawsuit was filed), and that he had decided against it. However, Mr. Theriot told Mr. Rousseau that the company would study his proposal and consider it.

At trial Mr. Rousseau presented elaborate calculations in which his figures

showed that the company could have spent less dollars by going to a PCP program rather than the March 1, 1984 layoff. An expert confirmed Mr. Rousseau's calculations but conceded on cross-examination that assuming vacation pay would accrue, the company would have saved a minimum of $5,000 per month by having the layoff instead of going to the PCP program.

Defendant put on evidence to show that Mr. Theriot asked James Kiesler, Offshore Division Manager, to study the program and give recommendations on the program. He spent approximately three days studying it, performing cost estimates, and finding out about the mechanics of the PCP program as it related to the seven-and-seven employment of the derrick barge crews. Mr. Kiesler testified that his cost estimates showed that the company would save an additional $15,000 per month by going to the layoff instead of PCP. He also concluded that operationally the program would have been difficult and complicated and was not something that he saw to be of benefit to the company or its employees. He also felt that the slight additional earnings that the employees would have received by going to the PCP program would not have improved morale that greatly, as compared to putting a reduced workforce back on a twelve-and-twelve basis, with a ten (10%) per cent cut in the pay rate. For these reasons, he recommended to Mr. Theriot that the company not go to the PCP program.

This Court is of the opinion that Teledyne had the exclusive right to decide on what course of conduct it would take to resolve its economic problems. Teledyne was not under a duty to implement the program that was least injurious to the employees. The Fair Labor Standards Act does not preclude an employer from making an adverse decision against an employee if that decision is not motivated by discriminatory reasons.

In the case of *Loeb v. Textron, Inc.*, 600 F.2d 1003 (1st Cir.1979), the Court was faced with an Age Discrimination in Employment Act claim. The A.D.E.A. also utilizes the Title VII *Burdine* standard of proof. *Stacey v. Allied Stores Corp.*, 581 F.Supp. 1103 (D.C.D.C.1984). The court stated in footnote six:

> "While an employer's judgment or course of action may seem poor or erroneous to outsiders, the relevant question is simply whether the given reason was a pretext for illegal discrimination. The employer's stated legitimate reason must be reasonably articulated and nondiscriminatory, but does not have to be a reason that the judge or jurors would act on or approve. Nor is an employer required to adopt the policy that will maximize the number of minorities, women, or older persons in his workforce. See *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 576–77, 98 S.Ct. 2943 [2949–50], 57 L.Ed.2d 957 (1978). An employer is entitled to make his own policy and business judgments, and may, for example, fire an adequate employee if his reason is to hire one who will be even better, as long as this is not a pretext for discrimination.

600 F.2d at 1012, n. 6. *See also Stacey v. Allied Stores Corp., supra; Williamson v. Owens-Illinois, Inc.*, 589 F.Supp. 1051 (N.D.Ohio W.D.1984).

The court went on to point out that the reasonableness of the employer's reasons may be probative of whether they are pretexts. "The more idiosyncratic or questionable the employer's reason, the easier it will be to expose it as a pretext, if indeed it is one." 600 F.2d at 1012, n. 6.

The evidence does not lead this Court to conclude that Teledyne's reasons were "idiosyncratic or questionable" or that they were a pretext. The defendant introduced evidence that they were experiencing an economic crisis and that they did investigate the PCP plan but determined it was infeasible. This decision is not "idiosyncratic." Under their cost analyses which included accrual of vacation time, Teledyne could save more money by using the layoff rather than the PCP program. This was corroborated by plaintiffs' expert witness. Although plaintiffs claim they did not need vacation because under PCP they would

have more time off, the Court recognizes that the employer may have considered that it was legally obligated to give vacation time. Indeed, in the only segment of the company ever temporarily put on a PCP program, the fabrication yard, the employees did continue to accrue vacation benefits. If vacation benefits were given generally within the company, Teledyne may have feared Title VII exposure by excluding these employees from those benefits.

Defendant also stated that they would have exposed themselves to greater liability under the PCP program due to its requirements. Under the PCP program, Teledyne would have been required to conduct midnight shift changes. A shift change at midnight out in the middle of the Gulf of Mexico is very hazardous. Teledyne's consideration of this factor is not "questionable."

Finally, the Court notes that several of the plaintiffs in the wage and hour lawsuit were not laid off and that besides the plaintiffs that were laid off, several other people lost their jobs. These were people who had never filed a suit against Teledyne. Teledyne followed a plan in deciding who to lay off. They determined job classification priorities that they felt were essential to man the barges that would be kept in service. After that, they went by seniority within job classification and determined who would be laid off, just as they had done in the 1980 layoff.

Considering all of the evidence the Court holds that the plaintiff has failed to meet its burden of proving that Teledyne's proffered reason for the layoff was a pretext for discrimination. The Court is satisfied that there was no evidence whatsoever that the defendant's decision to lay off the plaintiffs was in retaliation for the filing of the wage and hour lawsuit. The evidence and inferences point so strongly in favor of Teledyne Movible Offshore that reasonable minds could not arrive at a contrary verdict. Accordingly, the defendant's motion for judgment notwithstanding the verdict is GRANTED and judgment is entered in favor of the defendant.

At this point, the Court must consider defendant's alternative motion for a new trial pursuant to Federal Rule of Civil Procedure 50(c)(1). This ruling is conditioned upon a reversal or vacation of the judgment for defendant notwithstanding the verdict for plaintiff. It is the opinion of the Court that a new trial should be granted for the same reasons as advanced for the judgment notwithstanding the verdict. The Court rejects defendant's argument that a new trial should be granted on the basis of juror misconduct. The juror, Mrs. Kasperski, answered all questions truthfully. Her uncle, a former employee of Teledyne, is not a member of her "immediate family." Mrs. Kasperski did not give any indication that she could not be a fair and impartial juror.

For the foregoing reasons, it is:

ORDERED that judgment be entered in favor of the defendant in the wage and hour claims tried to the Judge.

FURTHER ORDERED that defendant's motion notwithstanding the verdict is GRANTED and judgment is entered in favor of the defendant in the retaliatory discharge claims.

FURTHER ORDERED that defendant's alternative motion for a new trial is CONDITIONALLY GRANTED.