**Robert CROOK**

v.

**Isaac RUSSELL, d/b/a Russell's Ambulance Service.**

Supreme Judicial Court of Maine.

Argued Sept. 14, 1987.
Decided Oct. 30, 1987.

Michael R. Poulin (orally), Laurie A. Gibson, Skelton, Taintor & Abbott, Auburn, for plaintiff.

Robert E. Mullen (orally), Linnell, Choate & Webber, Auburn, for defendant.

Before McKUSICK, C.J., and NICHOLS, ROBERTS, WATHEN, GLASSMAN, SCOLNIK and CLIFFORD, JJ.

SCOLNIK, Justice.

Robert Crook appeals from a judgment entered in the Superior Court, Oxford County, following a non-jury trial. Crook brought suit to recover overtime compensa-

tion and liquidated damages under 26 M.R. S.A. §§ 626 and 664 (Supp.1986) against Isaac Russell, the owner and operator of Russell's Ambulance Service in Norway for whom Crook formerly worked as an EMT. The trial justice found for Russell. Crook maintains on appeal that the trial justice's findings are clearly erroneous. We disagree and affirm the judgment.

Since 1970, Russell has owned and operated Russell's Ambulance Service on Main Street in Norway. Russell's Ambulance Service was under contract as the primary ambulance provider for the towns of Norway and South Paris during the period relevant to this case. Three ambulances were garaged at the station in Norway. Russell employed several Emergency Medical Technicians (EMT's) and ambulance attendants on either a full-time or part-time basis.[1] The ambulance service was staffed by a full-time day shift and a night shift consisting of full and part-time help. The day shift was from 8:00 a.m. to 5:00 p.m. and the night shift ran from 5:00 p.m. to 8:00 a.m. Approximately 75% of the calls received and runs made by the service were during the day shift in 1984. In addition to operating the ambulances when called, the day shift employees were responsible for stocking the ambulances with supplies and cleaning the ambulances and station area. The day shift was usually staffed by at least two EMT's.

The night shift was staffed on a voluntary basis. It was not a condition of employment that one work the night shift. The night shift employees were responsible for finishing up chores left undone by the day shift. Aside from that, their only assigned duties were to answer calls for assistance. The night shift workers were paid a flat fee of $15.00 for each night they worked,[2] in addition to 1½ times their usual hourly rate of pay for any time spent responding to a call. This flat fee was increased to $18.00 at the end of 1984. The night shift workers were employed on an on-call basis. They were free to leave the

station at any time, to tend to personal matters or even go home. When leaving the station, the night shift employees would phone Russell and either tell him of a phone number where they could be reached or they would take with them one of the two radios or the pager kept at the station. Any employee leaving the station at night was required to notify Russell of this fact by phone.

The night shift workers were not told that they had to meet a minimum response time to calls for assistance. However, Russell required his night shift employees to remain at or reasonably near the station. The night shift employees were also not allowed to drink alcohol, whether at the station or in their homes while on call. Day shift employees and employees on-call at night were required to wear a uniform prescribed by Russell consisting of dark pants, a white shirt, dark jacket and optional EMT patches. The trial justice found that Russell's loosely-defined uniform code did not force employees to dress in a way that was "so unique, ornate or restrictive that it would interfere with personal matters or cause them embarrassment if worn outside the work place."

If an on-call night shift worker chose to do so, he or she could remain at the station throughout the night. The station was equipped with a kitchen, lounge and a cable television. The station was frequently used as a gathering place for employees to socialize at night, even if they were not on-call. If an off-duty employee was present at the station when a call came in at night, the employee would be allowed to go out on the call if he or she wished to.

Crook was employed by Russell on a part-time basis starting in 1982. In June, 1984, Crook was employed by Russell as a full-time EMT, working the day shift 40 hours per week. During the time of his employment, Crook worked some night shifts in addition to his regular 40 hour week. His employment was terminated by Russell early in January of 1985.

---

1. EMT's are licensed by the State and have 100 to 120 hours training, whereas an attendant only has 40 to 50 hours of training.

2. This fee was paid whether or not a call was actually received during the shift.

After his discharge, Crook brought this action seeking overtime pay allegedly owed him under 26 M.R.S.A. § 664 [3] and requesting an award of liquidated damages, costs, and attorneys' fees pursuant to 26 M.R.S.A. § 626.[4] Before trial, he voluntarily dismissed other counts in his complaint. Crook based his statutory claim on the ground that, for the nights he was on call, he should have received overtime pay not only for the time spent responding to a call but for time spent waiting while on-call. After a trial, the trial justice determined that Crook's waiting while on-call at night did not constitute work within the meaning of the overtime statute; consequently, he held that Crook could not recover overtime pay or damages.

Crook urges that the trial justice's findings be overturned as clearly erroneous on three grounds: (1) the evidence showed that Crook was required to remain at or near the station during night shifts, (2) the time spent by Crook during the night shift was primarily for Russell's benefit and (3) the totality of circumstances show that Crook was employed for the time he waited on-call during night shifts.

### I.

The findings of fact of a trial justice sitting as a trier of fact will not be overturned by this court unless they are clearly erroneous. *Leadbetter v. Morse*, 510 A.2d 524, 526 (Me.1986); *Dunning v. Dunning*, 495 A.2d 821, 823 (Me.1985); *Tiemann v. Santarelli Enterprises, Inc.*, 486 A.2d 126, 132 (Me.1984). Such findings will be upheld on review if there is any competent evidence in the record to support them. The presence of evidence in the record that would support a contrary finding furnishes no basis for reversal. *Margani v. Sanders*, 453 A.2d 501, 504 (Me.1982).

Crook urges that the trial justice's failure to find that Russell's employees were required to remain at or near the ambulance station while on-call during the night shift was clearly erroneous. The justice's finding was as follows:

The only restrictions placed on the night shift personnel were that they remain reasonably available to provide an appropriate response time in the event of an emergency, that they refrain from the use of alcohol and that they be appropriately attired in company uniform.

(footnote omitted).

The justice's finding is amply supported by evidence in the record. Testimony of Marsha Coffman, an employee of Russell's, revealed that employees could take an ambulance home for at least part of an evening. Other testimony indicated that night shift employees could stay home and either be picked up by an ambulance en route to a call or drive a personal car to meet an ambulance at the scene of a call. Although Russell did testify that he required night shift employees to stay at or reasonably near the station, considering the foregoing testimony, the trial justice was not clearly erroneous in describing the requirement as one of remaining "reasonably available to provide an appropriate response time."

Crook argues that "reasonably available" actually meant being "at or near" the station. However, if the testimony previously discussed is believed, being "reasonably available" did not necessarily mean being "at or near" the station. Whether this testimony was to be believed was a credibility determination solely within the province of the trial justice, to which we

---

**3.** Section 664 reads, in pertinent part:
... [I]t is declared unlawful for any employer to ... require any employee to work more than 40 hours in one week, unless 1½ times the regular hourly rate is paid for all work done over 40 hours in any one week ...

**4.** Section 626 reads, in pertinent part:
Any employee leaving his or her employment shall be paid in full within a reasonable time after demand.... [A] reasonable time shall mean the earlier of either the next day on which employees would regularly be paid or a day not more than 2 weeks after the day on which the demand is made.... An employer found in violation of this section shall be liable for the amount of unpaid wages and, in addition, the judgment rendered in favor of the employee or employees shall include a reasonable rate of interest, an additional amount equal to twice the amount of those wages as liquidated damages and costs of suit, including a reasonable attorney's fee.

defer. *Blackmer v. Williams,* 437 A.2d 858, 863 (Me.1981).

## II.

Crook also challenges the trial justice's findings that (1) the time Crook spent waiting while on-call was not primarily for the benefit of Russell and that (2) Crook was not employed while waiting.

Whether waiting time is compensable for purposes of overtime pay is a question resolved by assessing the totality of the circumstances in a given case.[5] *Skidmore, et al. v. Swift & Co.,* 323 U.S. 134, 137, 65 S.Ct. 161, 163, 89 L.Ed. 124 (1944). One of the most significant factors courts have used in analyzing the totality of circumstances in overtime pay cases is whether time spent on-call is primarily for the benefit of the employer or for the benefit of the employee. *Armour & Co. v. Wantock,* 323 U.S. 126, 133, 65 S.Ct. 165, 168–69, 89 L.Ed. 118 (1944); *Allen v. Atlantic Richfield Co.,* 724 F.2d 1131, 1137–1138 (5th Cir. 1984); *Chelan County Deputy Sheriff's Ass'n. v. Chelan County,* 45 Wash.App. 812, 725 P.2d 1001, 1005 (1986).

■ Crook contends that the trial justice's failure to find that the time Crook spent on-call was primarily for the benefit of Russell was clearly erroneous. Crook's argument is based on those parts of the record that he cites which support his position. As we have stressed, the existence of testimony buttressing Crook's version of the case does not mean the trial justice's findings of fact were clearly erroneous if there is competent evidence in the record to support those findings. Here there was evidence that, far from being restricted in the use of their leisure time, Crook and other employees were free to come and go as they wished during the period of time they were on-call at night. Testimony the trial justice found credible indicated that no employee was forced to remain at the station while on-call. On the contrary, as members of a close-knit group of individuals engaged in specialized work in a small Maine town, they voluntarily sought out the company of one another at defendant's ambulance station. In these circumstances, the trial justice's failure to find that the time Crook spent on-call was primarily for the benefit of Russell was not clearly erroneous.

■ Crook next argues that the responsibilities of the day and night shifts were almost identical, in that the day shift employees spent most of their time waiting for a call, just as the night employees did. The trial justice found that the duties of the day shift employees were more substantial than those the night shift employees were expected to perform. Testimony showed that approximately 75% of the calls received by the ambulance service were handled by the day shift,[6] that the day shift was responsible for cleaning and restocking the ambulances and that the day shift was given responsibility for cleaning the station area. A review of this evidence makes clear that the trial justice's findings were not clearly erroneous or incomplete.

■ Crook's final contention is that the trial justice erred in not finding that the totality of circumstances showed Crook was employed by Russell while on-call, within the meaning of the overtime statute. As previously noted, the standard used for determining whether an employee is working while on-call and is therefore entitled to overtime pay is the totality of circumstances in a given case. This is a factual question that will vary from case to case and is to be resolved by the findings of a trial court. *Skidmore,* 323 U.S. at 136–137, 65 S.Ct. at 163; *Irwin v. Clark,* 400 F.2d 882, 884 (9th Cir.1968); *Rousseau v. Teledyne Movible Offshore, Inc.,* 619 F.Supp. 1513, 1517 (W.D.La.1985), rev'd on other grounds, 805 F.2d 1245 (5th Cir.1986), rehearing denied, 812 F.2d 971 (5th Cir.1987).

---

**5.** Maine's minimum wage and overtime law defines "employ" as "to suffer or permit to work." 26 M.R.S.A. § 663 (1974). "Work" is not defined; what constitutes "work" must therefore be determined from the facts of a given case.

**6.** The actual figure for 1984 was 73.5%.

Ignoring *Skidmore*'s instruction that "[e]ach case must stand on its own facts," 323 U.S. at 140, 65 S.Ct. at 164, Crook contends that several prior cases demonstrate the trial justice erred in his findings. None of these cases replicate the facts of the case before us. What constitutes "work" under the totality of circumstances in a given case is a uniquely factual determination. Here we are not in the position of the trial justice, who as the trier of fact was able directly to assess the demeanor and credibility of the witnesses whose testimony he heard. There was credible evidence on the record to support the trial justice's findings of fact. Considering the fact-bound nature of a proceeding such as this, we will not overturn his findings.

The entry is:

Judgment affirmed.

All concurring.