**Michael CARYK, et al., Plaintiffs,**

v.

**George A. COUPE, et al., Defendants.**

**Civ. A. No. 84–0730.**

United States District Court,
District of Columbia.

Feb. 27, 1987.

**1244**

Sydney E. Rab, Woodbridge, Va., and Barbard D. Lindskold, Washington, D.C., for plaintiffs.

Jeffrey L. Berger, Shawn, Berger & Mann, Washington, D.C., for defendants.

## OPINION

JUNE L. GREEN, District Judge.

This action is brought by 10 chauffeurs formerly with Admiral Limousine Service ("Admiral") to recover past-due wages and overtime compensation for the years 1981–1984, pursuant to the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq.* (1982), and the District of Columbia Mini-

mum Wage Act ("D.C. Minimum Wage Act"), 36 D.C.Code §§ 201 *et seq.* (1981). A trial to the Court was followed by extensive post-trial briefing.

## I. *Findings of Fact*

Defendants George A. Coupe and Bernard Resnick, at all material times herein, have done business as Admiral Limousine Service, a partnership providing chauffeur-driven limousines to the public and government for hire. Transcript ("Tr.") at 665–66. Admiral maintains an office and garage at 1243 First Street, S.E., Washington, D.C., and a bookkeeping office in Alexandria, Virginia. Admiral is an employer involved in interstate commerce. Tr. at 646–47.

The majority of Admiral's work involves servicing the business needs of clients from Monday through Friday, with most jobs beginning between 8:30 a.m. and 5:00 p.m. Most jobs were arranged and assigned to chauffeurs at least one day in advance. Tr. at 232, 508, 604, 655–59, 666–67.

Each chauffeur was expected to arrive at work in uniform. He would report to the dispatcher who then assigned him a vehicle. Tr. at 138, 384. It then became the responsibility of the chauffeur to make sure his assigned vehicle was clean, fueled, and in satisfactory mechanical order. Tr. at 138, 184. The chauffeur would then remain on call until given a driving assignment. Tr. at 141.

Upon completion of a driving assignment, the driver would either return to the office or call in to the office with the necessary billing information. Tr. at 657. Admiral did not normally require its chauffeurs to keep or turn in job slips, which record the name of the customer and the various stops made. Tr. at 267, 773–74.

Chauffeurs were compensated for driving in several ways. For most assignments, chauffeurs were paid one-third of the average customer charge. There was a three-hour minimum for most driving assignments, and chauffeurs would receive one-third of the three-hour minimum charge even though their actual work time was less than three hours. Tr. at 674–78. For trips to area airports, chauffeurs were paid a flat fee: $10.00 to National Airport, $20.00 to Dulles Airport, and $23.33 to Baltimore-Washington International Airport. Tr. at 678. For out-of-town trips, chauffeurs received one-third of a dollar per mile. *Id.* At most times pertinent hereto, chauffeurs earned between $7.50 and $20.00 per hour of driving. *Id.*

During all times material herein, there was a specific waiting time, or "guaranty" agreement between Admiral and its employees. A chauffeur had the option to be paid, and Admiral agreed to compensate him, for time spent at Admiral's office waiting to be dispatched if certain conditions were met by the chauffeur. The terms of the agreement were posted on an information sheet in the chauffeurs' lounge as follows:

> Guaranty is $30.00 for an 8 hour day and covers the time from 8:30 a.m. to 5:00 p.m. Guaranty is secured for any jobs totalling under $30.00 between 8:30 a.m. and 5:00 p.m. Guaranty is secured for any job that begins at 5:01 p.m. or after. You must be on time to collect the guaranty.

Defendants' Exhibit 4; Tr. at 683.

The guaranty agreement was available Monday through Friday. The chauffeurs understood that they were not entitled to be paid for waiting past 5:00 p.m., and that the guaranty was not available on the weekend except by special arrangement. The guaranteed wage was $20.00 until September 1981, when it was raised to $30.00. Tr. at 164–67, 177, 183, 210–11, 230, 294–95, 578, 678.

While it is apparent that Admiral maintained this waiting time arrangement so as to ensure the ready availability of chauffeurs to meet the unpredictable number of calls for service it received, most of the jobs were assigned the day before by telephone, by the two-way car radio, in person, or if the client assignment continued. Tr. at 667, 784. Such being the case, most of Admiral's chauffeurs did not participate in the waiting time arrangement.

Beginning in January 1983, Admiral required its chauffeurs to sign a "sign-in

sheet" by 8:30 a.m. to be eligible for the guaranty. If a chauffeur waited all day, he was required to sign out at 5:00 p.m. Chauffeurs who remained at the office pursuant to the guaranty agreement were not free to come and go at their pleasure. Tr. at 142. Chauffeurs who arrived after 8:30 a.m. were free to leave as they were not entitled to be paid for waiting under the guaranty agreement. Tr. at 684–85. Those chauffeurs who preferred to wait at home or elsewhere, awaiting assignment by telephone or electronic pager, did enjoy freedom of mobility. Tr. at 67, 115, 342.

Admiral maintained "limousine sightseeing work records" which recorded on a daily basis each driving assignment. These records included the time the chauffeur began and ended each job, any prearranged gratuity, the customer's name, place of pickup, the chauffeur's name and the car number to which he or she was assigned. The limousine sightseeing records did not always indicate the points of destination. In many places, the records state "one way only" or "as directed." In such cases, there is no recordation of the various locations to which the chauffeur travelled. The limousine sightseeing work records also indicated whether a chauffeur was off work, late, had been assigned a job the previous day, and whether the chauffeur took home an assigned limousine the night before. Defendants' Exhibits 1(a)–1(d); Tr. at 651–57, 668–71.

Admiral relies upon the limousine sightseeing work records to collect its data for billing and pay purposes. Tr. at 651. In compensating the chauffeurs, the data is then transcribed onto the daily payroll records. Plaintiffs' Exhibits 11–14. These payroll records list the amount due each chauffeur for each job, any gratuities due, and whether any sum was due pursuant to the guaranty agreement as shown by a "G" in the appropriate column. The payroll records also recorded whether chauffeurs were off work, on vacation, and whether they were to be charged for taking a car home or for the installment purchase of an electronic pager. Tr. at 660–65. The charge for taking a limousine home overnight was $10.00.

The compensation due each chauffeur is then computed artificially so as to reflect regular hours and overtime hours. Tr. at 736. Admiral pretends that the first $160 earned by a chauffeur in a workweek constitutes 40 hours of straight pay at $4.00 per hour, despite the actual rate of $7.50 to $20.00 per hour. *Supra* at 3. Admiral then assigns the balance of the chauffeur's earnings to overtime at $6.00 per hour, irrespective of the actual working hours, many of which went into the night. Any leftover figures are designated as tips. Tr. at 763–65. Admiral prepared this artificial breakdown of the chauffeurs' compensation ostensibly to satisfy the District of Columbia Minimum Wage Board's requirement that employers report their employees' compensation on an hourly basis. Tr. at 736.

These artificial figures are then transcribed on each chauffeur's quarterly payroll record and onto each chauffeur's pay stub. Plaintiffs' Exhibits 1–10. So for every paycheck received by the chauffeur, the hours listed are wrong, the gratuities listed are wrong, and the hourly rate is listed incorrectly as $4.00 per hour. Tr. at 772. Thus, during the time period relevant to this litigation, Admiral did not maintain records of the total number of hours each chauffeur drove, or the aggregate number of hours he worked in any given week. Tr. at 765–66. The chauffeurs, however, do have an opportunity to correct any inaccuracies in pay by submitting a "shortage sheet." Such claims for additional compensation were reviewed and, if valid, corrected. Tr. at 717–18; Plaintiffs' Exhibit 51.

Admiral compiled summaries of wages due each plaintiff from the limousine sightseeing work records and the payroll records. The summaries include driving and waiting hours during the period March 1981, through February 1984. The summaries purport to indicate if and by how much any plaintiff's wage rate in a given week fell below the minimum wage rate required by law and the number of hours, if any, that each plaintiff worked in the District of Columbia in excess of 40 hours in a week without being paid an overtime premium of

one-half of the regular rate. Tr. at 688–712; Defendants' Exhibits 9a–9j.

Defendants compiled these summaries using a variety of sources and a variety of techniques. In calculating waiting hours in 1981 and 1982 when there was no sign-in sheet available, for any weekday for which plaintiffs Hardmon, Cole, Gomez, Mascarenhas, Idelbi, or Singh claimed to have waited, Admiral credited them with their claimed waiting time as follows: On days when the records indicated that they were given the full waiting time guarantee, i.e., $30.00, and did not drive between 8:30 a.m. and 5:00 p.m., they were credited with eight waiting hours. Where these plaintiffs received a partial guarantee, i.e., $15.00, they were credited with eight waiting hours less any driving hours prior to 5:00 p.m. Admiral then reviewed its records to determine if Messrs. Hardmon, Cole, Gomez, Mascarenhas, Idelbi, or Singh had a carry-over job, or a preassigned limousine and job. If one of these factors existed, Admiral assumed that the chauffeur would have no reason to come into the office to wait at 8:30 a.m., and, therefore, not be entitled to any waiting time credit. If these factors did not exist on a given day and these plaintiffs earned more than the guaranteed wage from working between 8:30 a.m. and 5:00 p.m., in accordance with the waiting time agreement, they were credited with all non-driving hours beginning at 8:30 a.m., up until the time they earned an amount equal to the full guarantee from driving, less one-half hour for lunch.

Plaintiffs Caryk, Wilson, and Williams were not treated similarly for days on which they had no guarantee because they customarily did not wait in the office. Tr. at 17, 76, 245, 327. Plaintiff Stokes does not claim any waiting time. Tr. at 115.

As to waiting hours in 1983 and 1984, Admiral credited each plaintiff, except Mr. Caryk, with having waited at the office beginning at 8:30 a.m., for any day on which he signed the sign-in sheet by 8:30 a.m., or received the guaranteed wage as indicated by a "G" on the payroll records. If the plaintiff had no driving assignment before 5:00 p.m., he was credited with eight waiting hours. If the plaintiff had a driving assignment prior to 5:00 p.m., in accordance with the waiting time agreement, he was credited with waiting time beginning at 8:30 a.m. until he earned $30.00 from driving. If he earned less than $30.00 from driving prior to 5:00 p.m., he was credited with eight waiting hours.

Admiral credited plaintiff Caryk with waiting time beginning at 8:30 a.m. only on days when he signed in by 8:30 a.m. Admiral did not credit Mr. Caryk with waiting time at any other time because, with a few exceptions, he did not wait at the office even when he received the guarantee. Tr. at 712.

Admiral dispatches chauffeurs to the District of Columbia and to neighboring States. Pursuant to the D.C. Minimum Wage Act and the Motor Carrier Safety Act of 1984, plaintiffs are entitled only to have hours spent in the District of Columbia count toward overtime compensation. D.C.Code § 36–203 (1981); 29 U.S.C. § 213(b)(1) (1982); infra at 17. Thus, in calculating hours worked in the District of Columbia, Admiral subtracted driving hours which occurred outside the District of Columbia from each plaintiff's total hours for each week. Admiral reviewed the pick-up and drop-off point of each assignment in determining driving hours spent outside the District of Columbia. To the extent that Admiral could not find any specific driving hours spent outside the District of Columbia in a given week, it arbitrarily reduced plaintiff's claim even though Admiral's records were incomplete for the entries which specified no location. Tr. at 693–95, 775–76.

Each plaintiff, except John Hardmon, testified as to his customary work practices, whether he signed in by 8:30 a.m. and waited until 5:00 p.m., what he did while waiting for work, etc. Messrs. Caryk, Wilson, and Stokes relied principally upon personal driving diaries, or logs, in which they recorded details about their workdays, e.g., what time they began work, where they went, personal errands they ran, etc., in challenging Admiral's summary of wages

due as insufficient. Plaintiffs' Exhibits 47, 48, 49, 52, 53, 54, 55, 62, 63, 64. Messrs. Cole, Gomez, Idelbi, Singh, and Ms. Williams relied principally upon their pay stubs and job assignment slips to buttress their challenge of Admiral's summary. Plaintiffs' Exhibits 66, 67, 69–75, 77–80, 83–88. Mr. Mascarenhas presented no similar documentary evidence. Nonetheless, in comparing plaintiffs' records and testimony with Admiral's limousine sightseeing work records and the summary of wages due, the Court found no inconsistencies.

Defendants offered the testimony of several Admiral dispatchers and other employees to refute claims by Messrs. Idelbi, Singh, Gomez, Mascarenhas, and Ms. Williams that they waited regularly at the office pursuant to the waiting time guarantee. Tr. at 613–14, 682. While this testimony did not impress the Court as being accurate always, the plaintiffs were unable to produce any reliable evidence indicating that they did wait in accordance with the waiting time agreement any more frequently than defendants acknowledged. Tr. at 582–84. Indeed, Messrs. Mascarenhas and Gomez admit claiming waiting time even though they were not entitled to it by the terms of the guaranty agreement. (Tr. at 217–21; 406; 409–10), and Messrs. Idelbi, Singh, and Ms. Williams seemed to misinterpret deliberately the terms of the agreement. Tr. at 161–67; 318–22; 270–71. Still, defendants' sign-in records are not conclusive. The sign-in sheets were not introduced until January 1983, and strict adherence to the terms of the waiting time agreement was sometimes waived. Tr. at 684–85.

The waiting time claims of Messrs. Caryk and Wilson must be considered in a different light. Mr. Caryk did not wait at the office. He conceded that as a rule he was not in the office after 10:30 a.m., that he spent time playing cards at a local cab company garage, and that he occasionally took Admiral's car to the race track for his own benefit. Tr. at 326–27, 342–50. Mr. Caryk experienced great difficulty explaining how he arrived at his claimed driving and waiting hours. Tr. at 361–64. Mr.

Caryk's testimony was simply incredible. Tr. at 351–59.

Mr. Wilson's waiting time claim is no stronger. Mr. Wilson did not wait in the office, and he did not want to abide by the terms of the waiting time agreement. Tr. at 76–77. Mr. Wilson much preferred his freedom as evidenced by the many personal errands for which he used Admiral's limousine and the manner in which he chose to spend his waiting time, sitting or sleeping in his limousine outside a local hotel or visiting a small library. Tr. at 17, 39, 62–65.

In addition, Messrs. Stokes and Wilson claim that defendants retaliated against them for seeking legal advice about a possible claim for unpaid wages. They allege that Mr. Coupe revoked their privilege of taking a limousine home at night and restricted their driving work, resulting in lost earnings.

John Stokes testified that during the last week of January 1984, Mr. Coupe called a general meeting of drivers where he remarked that he was surprised to learn about certain drivers suing him. Tr. at 100. Significantly, no one else corroborated Mr. Stokes' recollection of this meeting and no notation of the meeting is to be found in Mr. Stokes' driving diary. Plaintiffs' Exhibit 64. Directly following this meeting, Mr. Stokes asserts that Mr. Coupe called him into a private meeting and indicated his concern that Mr. Stokes was suing Admiral. Tr. at 98. Immediately following this private meeting, Mr. Stokes said that he had to "turn in" his assigned limousine and could not use it for transportation to and from home. Tr. at 102. Consequently, Mr. Stokes testified that his earnings declined because he received fewer driving assignments. Tr. at 103.

There was further evidence presented of a work-related problem involving Mr. Stokes during this same time period. On January 29 until February 1, 1984, Mr. Stokes drove a Mr. Demerjian, taking the limousine home each night. Mr. Stokes completed this assignment, but he kept the limousine for several days thereafter. Mr. Coupe discovered that contrary to his in-

structions Mr. Stokes had put Mr. Demerjian's limousine bill on the hotel bill where Mr. Demerjian was staying. By billing through the hotel, Admiral was required to pay $288.00, 20 percent of the bill, to the hotel. Tr. at 104–05.

On February 1, 1984, Mr. Coupe sought to contact Mr. Stokes to discuss this problem. Despite the fact that Mr. Stokes was in possession of an Admiral limousine and had an electronic pager, Mr. Coupe was unable to contact Mr. Stokes despite repeated attempts over two days. Tr. at 628–29, 721–22.

At Mr. Coupe's instruction, Mr. Stokes came to the Alexandria office on February 3, 1984. Mr. Coupe noted his displeasure about the Demerjian billing and his inability to contact him for two days. Tr. at 723. As a consequence, Mr. Coupe instructed Mr. Stokes to leave the limousine in the Admiral garage at the end of the day unless he had a night assignment and needed to take it home. *Id.* A review of the limousine sightseeing work records and Mr. Stokes' driving diary leads the Court to conclude that he was required to leave his assigned limousine at the garage for legitimate reasons, and his subsequent reduction in income is attributable to his refusal of assignments and taking vacation days in February and March. Tr. at 725–28; Defendants' Exhibit 1(d); Plaintiffs' Exhibit 64.

Mr. Wilson testified that he had a conversation with Mr. Coupe on January 30, 1984. Mr. Wilson asserts that Mr. Coupe asked him about the possibility of Wilson's suing Admiral. Mr. Wilson admitted that he was suing Admiral, whereupon Mr. Coupe demanded that Mr. Wilson return his assigned limousine to the garage. Tr. at 54, 811. That evening Mr. Wilson testified that he received a phone call from defendant Resnick. According to Mr. Wilson, Mr. Resnick accused him of "jumping on the bandwagon ..." with others who were suing Admiral. Tr. at 55; Plaintiffs' Exhibit 55. The reference was apparently to two Admiral chauffeurs who had previously filed a lawsuit against Admiral claiming

unpaid wages. Tr. at 55. Mr. Resnick was unable to testify at trial.

Mr. Coupe acknowledges that he instructed Mr. Wilson to leave his assigned limousine in the garage, but that he did so for legitimate disciplinary reasons. Tr. at 720, 731. On January 29, 1984, Mr. Wilson accepted a three-day assignment for a Mr. Kojima, acknowledged to be one of Admiral's best clients. Tr. at 623. Having been off work the previous week due to illness, Mr. Wilson had a scheduled doctor's appointment on January 30, 1984. In order to make this appointment, Mr. Wilson would require another chauffeur to drive Mr. Kojima in his absence. Plaintiff's Exhibit 55. While Mr. Wilson was unsure whether he gave the dispatcher advance notice of his appointment, the dispatcher testified that Mr. Wilson called in to be relieved unexpectedly. Tr. at 623. Admiral experienced some difficulty in providing Mr. Kojima a replacement chauffeur on such short notice, resulting in some inconvenience to a valued customer. Tr. at 624. Later that day, Mr. Coupe expressed his displeasure about Mr. Wilson's behavior and instructed him to return his assigned limousine to the garage. Tr. at 719.

Thereafter, on January 31, 1984, Mr. Wilson was offered a job driving a truckload of luggage to New York for another of Admiral's important clients. Tr. at 720, 813, 821–22. Mr. Wilson refused this job, citing safety concerns and what he thought would be poor pay. Tr. at 812–13, 818. It was in response to this, in addition to the incident while driving Mr. Kojima, that Mr. Coupe decided to revoke Mr. Wilson's overnight car privileges. Tr. at 720. Thereafter, the records reflect that Mr. Wilson refused various jobs and took numerous days off until he left voluntarily Admiral's employment. Tr. at 721; Plaintiffs' Exhibit 55; Defendants' Exhibit 1(d).

There was no evidence adduced at trial that Mr. Coupe was aware of Mr. Wilson's intention to sue Admiral before the beginning of February 1984. Tr. at 720; Plaintiffs' Exhibit 55. Indeed, it appears that Mr. Wilson was disciplined for a legitimate

reason and in a customary fashion. Tr. at 729–33.

## II. *Conclusions of Law*

Jurisdiction is conferred on this Court over the federal claims by 28 U.S.C. § 1337 and 29 U.S.C. § 216(b), and on the local claims by virtue of pendent jurisdiction.

### A. *Compensation Claims*

■ Plaintiffs seek to recover wages that defendants failed to pay, unpaid minimum wages, and overtime compensation. The overtime provisions of the FLSA do not apply to Admiral since, as a business involved in the interstate transportation of passengers, it is covered by the Motor Carrier Safety Act of 1984. 29 U.S.C. § 213(b)(1) (1982); *see also Overnight Motor Transportation Co., Inc. v. Missel,* 316 U.S. 572, 582, 62 S.Ct. 1216, 1222, 86 L.Ed. 1682 (1942) (construing the predecessor Motor Carrier Act of 1935). To the extent that plaintiffs performed service within the confines of the District of Columbia, they are entitled to overtime compensation under the D.C. Minimum Wage Act and the District of Columbia Wage-Hour Board Wage Order No. 12 ("D.C. Wage Order No. 12"), covering miscellaneous occupations. D.C.Code § 36–203; *District of Columbia v. Schwerman Trucking Co.,* 327 A.2d 818, 825 (D.C.App.1974).

■ Minimum wage compliance must be measured by the workweek by dividing the number of hours worked into the compensation for the week. *Dove v. Coupe,* 759 F.2d 167, 172 (D.C.Cir.1985). Plaintiffs are entitled to have the higher of the applicable minimum wage provision of the federal or District of Columbia wage and hour laws for the periods at issue. *See Central Delivery Service v. Burch,* 355 F.Supp. 954 (D.Md.1973). The applicable hourly rates are:

Up to October 30, 1981: $3.35

After October 31, 1981: $3.90

29 U.S.C. § 206(a)(1); D.C. Wage Order No. 12.

Based upon the filing date of this action, March 7, 1984, the joinder dates of various plaintiffs, and their dates of employment, the relevant periods of time for each plaintiff based upon the three-year statute of limitations is as follows:

| | | | |
|---|---|---|---|
| Caryk | 3/07/81 | – | 9/24/83 |
| Cole | 9/13/83 | – | 12/31/83 |
| Gomez | 10/24/81 | – | 6/15/83 |
| Hardmon | 7/04/81 | – | 2/04/84 |
| Idelbi | 3/07/81 | – | 2/25/84 |
| Mascarenhas | 9/09/83 | – | 3/07/84 |
| Singh | 3/26/81 | – | 2/28/83 |
| Stokes | 3/07/81 | – | 3/07/84 |
| Wilson | 3/07/81 | – | 3/07/84 |
| Williams | 9/27/81 | – | 11/05/83 |

D.C.Code § 36–216.

■ The record-keeping provisions of the D.C. Minimum Wage Act and the FLSA require that an employer maintain accurate records of each employee's wages and hours. D.C.Code §§ 36–211, 36–213 (1981); 29 U.S.C. § 211(c) (1982); *see also Williams v. Tri-County Growers, Inc.,* 747 F.2d 121, 128 (3d Cir.1984) (Estimating hours worked violates 29 U.S.C. 211(c)). Nevertheless, during the time period in this litigation, Admiral failed to maintain records of the total number of hours each chauffeur drove, or the aggregate number of hours he worked, in any given week. Furthermore, the pay receipts issued to the chauffeurs list incorrectly the hourly rate, gratuities received, and the number of hours worked. Indeed, the fact that Admiral found it necessary to compile for purposes of this trial the summaries of wages due each plaintiff illustrates well their violations of these record-keeping requirements, not to mention the present controversy that these infractions have engendered.

Because Admiral did not maintain complete records of the hours worked by each plaintiff, the Court must weigh the evidence adduced at trial in order to determine the actual number of hours for which plaintiffs should be credited. The Supreme Court has ruled that when an employer fails to maintain such records "and the employee cannot offer convincing substitutes," the employee has carried his burden "as a matter of just and reasonable inference" if he proves that he was improperly paid and then demonstrates his hours of work. *Anderson v. Mt. Clemens Pottery*

*Co.*, 328 U.S. 680, 687, 66 S.Ct. 1187, 1192, 90 L.Ed. 1515 (1946); *see also Majchrzak v. Chrysler Credit Corp.*, 537 F.Supp. 33, 37 (E.D.Mich.1981) (The responsibility for keeping accurate records pursuant to 29 U.S.C. § 211(c) "is neither delegable nor dischargeable.") (citations omitted). In other words, "the burden shift[s] to [defendants] to pinpoint evidence of the precise amount of work performed or to negative the reasonableness of the inferences to be drawn from [plaintiffs'] evidence." *Dove v. Coupe*, 759 F.2d at 174–75.

■ While plaintiffs demonstrated that they were paid improperly, they failed to contradict Admiral's driving time records; consequently, the Court will rely on them in assessing damages. However, Admiral's method of calculating the portion of each chauffeur's total hours worked within the District of Columbia so as to comply with the D.C. Minimum Wage Act, was neither accurate nor reasonable. *Supra* at 9–10. Plaintiffs must not be penalized due to Admiral's failure to maintain records that memorialize consistently the destinations or mileage outside the District of Columbia.

The most contentious issue of this suit concerns the interpretation of the waiting time agreement. In determining the compensability of waiting time, the Court is guided by the words of Justice Jackson in *Skidmore v. Swift & Co.*, 323 U.S. 134, 137, 65 S.Ct. 161, 163, 89 L.Ed. 124 (1944):

Whether in a concrete case ... [waiting] time falls within or without the [FLSA] is a question of fact to be resolved by appropriate findings of the trial court.... This involves scrutiny and construction of the agreements between the particular parties, appraisal of their practical construction of the working agreement by conduct, consideration of the nature of the service, and its relation to the waiting time, and all of the surrounding circumstances. Facts may show that the employee was engaged to wait, or they may show that he waited to be engaged.

*Accord* 29 C.F.R. § 785.14 (1986).

In following *Skidmore v. Armour & Co.*, 323 U.S. 134, 65 S.Ct. 161, the courts have recognized agreements between parties in determining the compensability of waiting time. In *Allen v. Atlantic Richfield Co.*, 724 F.2d 1131 (5th Cir.1984), for instance, security guards brought suit against their employer for additional overtime compensation, claiming that the hours spent waiting on the employer's premises in anticipation of labor strife were compensable. In analyzing the guards' claim, the circuit court looked to the agreement between the parties to determine "whether time is spent predominately for the employer's benefit or the employee's." *Id.* at 1137; *see also Rousseau v. Teledyne Movible Offshore, Inc.*, 619 F.Supp. 1513, 1520 (D.C.La.1985).

■ The waiting time agreement here is controlling as to compensable waiting hours, particularly in the absence of any evidence that plaintiffs were required to wait at the office. The great majority of driving assignments were given to the chauffeurs at least one day in advance, thus obviating the need to sit at the office awaiting dispatch. The waiting time agreement was offered, so it appears to the Court, as an incentive to provide a ready pool of chauffeurs capable of responding to clients' unexpected calls. In order to satisfy Admiral's needs, however, it was essential that those seeking the guaranty comply with the terms of the agreement, *i.e.*, be on time. As an alternative, Admiral was able to provide chauffeurs for unexpected calls by contacting them at their homes by telephone or electronic pager.

If chauffeurs were not on time as the waiting time agreement stipulated, they were not entitled to the guaranteed wage and were free to leave. Plaintiffs were fully aware of this policy, and they testified that they did not expect to be paid for waiting if they were not on time.

Indeed, in a similar case, an employer stipulated an agreement whereby the employees would receive a guaranteed wage in the event there was no work. The court found that for hours when employees were not required to remain on the employer's premises, they were not entitled to be compensated. *Goldberg v. Gable, dba Gable Well Service*, 45 Lab.Cas. (CCH) ¶ 31,303,

at 41,352 (D.Kan.1962). In that case, an oil well servicing company required employees to report at 7:00 a.m., and employees were paid by the hour if there was work. If there was no work, employees were free to come and go as they pleased, provided that they notify the company as to their whereabouts in the event of well servicing work. After 3:00 p.m., the employees need no longer leave word on where they could be reached. The court noted that "because of the nature of the work and by reason of the fact that employees could not be assured of a job or call each day, and in order to retain the services of experienced men upon a crew, the defendant guaranteed a 40–hour week to all employees.... [S]uch guarantee was applicable, however, only in the event the men reported and were available as required." *Id.* at 41,352. The court concluded that the employees were entitled to compensation agreed to under the 40–hour week guarantee, only the hours between 7:00 a.m. and 3:00 p.m. Beyond that, when employees could come and go at will, were hours when the employees were "waiting to be engaged," and were not compensable. *Id.* at 41,353; *see also Gaibis v. Werner Continental, Inc.*, 565 F.Supp. 1538, 1549–50 (W.D.Pa.1983), *vacated on other grounds, sub nom., Vosch v. Werner Continental, Inc.*, 734 F.2d 149 (3d Cir.1984) (Where employee "not personally required to stand by to receive the dispatch call, he/she is considered to be relieved from work ..." and time is not compensable under FLSA).

■ Moreover, even if plaintiffs could have shown that in instances where they had not complied with the terms of the waiting time agreement but waited at Admiral's office anyway because of a greater likelihood of receiving work, this would not alter the fact that they were "waiting to be engaged" during those hours, and not covered by the agreement. In *Irwin v. Clark*, 400 F.2d 882, 884 (9th Cir.1968), *cert. denied*, 393 U.S. 1062, 89 S.Ct. 715, 21 L.Ed.2d 706 (1969), the circuit court rejected an "economic compulsion" argument, holding that waiting time was not compensable merely because employees who were immediately available received the most

work. In that case, as here, the employees were not required, as a condition of their employment, to report at a particular time or remain on the employer's premises for any period. *See also Rousseau v. Teledyne Movible Offshore, Inc.*, 619 F.Supp. at 1519–20 (citing *Allen v. Atlantic Richfield Co.*, 724 F.2d at 1136). (The fact that the employer benefits from employees' waiting on the premises does not resolve the issue of whether the actual time spent is predominantly for the employer's benefit.)

Accordingly, plaintiffs' reliance on 29 C.F.R. §§ 778.318(c), 785.11 (1986), and D.C. Wage Order No. 12, which indicate, in part, that any time an employee is "suffered or permitted" to work should be compensated, is misplaced. There is no evidence that plaintiffs were required to wait outside the terms of the waiting time agreement or perform additional tasks for the employer's benefit.

■ Thus, plaintiffs are not entitled to compensation for time spent waiting outside the terms of the waiting time agreement. Further, the time that Messrs. Caryk and Wilson claim to have been waiting outside the office are not compensable, despite their assertions that they were "on call." This type of "on call" time which they spent on personal business, is addressed specifically by regulation. "An employee who is not required to remain on the employer's premises but is merely required to leave word ... with company officials where he may be reached is not working while on call." 29 C.F.R. § 785.17 (1984); *see Armour & Co. v. Wantock*, 323 U.S. 126, 132–33, 65 S.Ct. 165, 168–69, 89 L.Ed. 118 (1944); *see also* 29 C.F.R. § 778.-223 (1986).

Returning to the *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. at 687, 66 S.Ct. at 1192, analysis, plaintiffs have not carried their burden by failing to produce sufficient evidence demonstrating that Admiral's records of waiting time are incomplete or inaccurate for the years 1983 and 1984. As noted earlier, in January 1983, Admiral instituted a sign-in procedure to verify com-

pliance with the terms of the waiting time agreement. *Supra* at 4.

For the years 1981 and 1982, years when Admiral did not keep records of waiting time, Admiral has made representations that it "conceded most of the claimed waiting time of ..." each plaintiff, except Messrs. Caryk and Wilson. Defendants' Post-trial Brief at 15. Had defendants not volunteered this concession, the Court would have directed it as their failure to maintain any waiting time records for 1981 and 1982 exposes them to full liability. *Anderson v. Mt. Clemens Pottery Co.*, 323 U.S. at 687, 66 S.Ct. at 1192; *Dove v. Coupe*, 759 F.2d at 174–75. The bulk of Messrs. Caryk's and Wilson's claims for waiting time are rejected in light of their testimony pursuant to 29 C.F.R. § 785.17 (1986). *Supra* at 11.

Based on the foregoing, the Court awards each plaintiff unpaid minimum wages and overtime compensation as follows:

| Chauffeur | Minimum Wages | Overtime | Overtime Premium– 20% | Total |
|---|---|---|---|---|
| Michael Caryk | $ 0 | $ 252.64 | $ 50.53 | $ 303.17 |
| Donald W. Cole | 0 | 101.42 | 20.28 | 121.70 |
| Jose Gomez | 0 | 261.03 | 52.21 | 313.24 |
| Nathanial Hardmon | 0 | 90.58 | 18.12 | 108.70 |
| Abdul Idelbi | 0 | 2,059.06 | 411.81 | 2,470.87 |
| Carlos Mascarenhas | 0 | 337.43 | 67.49 | 404.92 |
| Bhanwar Singh | 0 | 1,069.10 | 213.82 | 1,282.92 |
| John Stokes | 41.87 | 3,624.86 | 724.97 | 4,349.83 |
| Betty Williams | 0 | 22.87 | 4.57 | 27.44 |
| John Wilson | 73.43 | 1,193.51 | 238.70 | 1,432.21 |

*See* 29 U.S.C. § 206(a) (1982); D.C.Code § 36–203(a) (1981).

In calculating these awards, the Court relied principally upon defendants' summary of wages due for the reasons stated *supra* at 10–11. Plaintiffs' claims were significantly greater, but they were either unsupported or rejected based upon the Court's interpretation of the waiting time agreement.

■ The overtime premium of 20 percent included in the above chart, represents the Court's estimate of additional overtime hours worked within the District of Columbia. As noted *supra* at 20, defendants' calculation of overtime hours for purposes of the D.C. Minimum Wage Act was flawed. The disjointed testimony and the voluminous records submitted in this case, covering 156 weeks and representing a variety of data for 10 plaintiffs, have combined to thwart the Court in its efforts to analyze the claims for overtime hours worked in the District of Columbia with anything approaching chemical exactness.

*See Anderson v. Mt. Clemens Pottery Co.*, 323 U.S. at 687–88, 66 S.Ct. at 1192–93; *Majchrzak v. Chrysler Credit Corp.*, 537 F.Supp. at 38; *cf. Copeland v. Marshall*, 641 F.2d 880, 903 (D.C.Cir.1980) (In deciding attorney fee cases, courts need not engage in an overly burdensome detailed analysis of every fact of the professional representation.)

**B.  *Messrs. Stokes' and Wilson's Retaliation Claims***

■ In order to establish a *prima facie* case of retaliatory action under the FLSA, a plaintiff must demonstrate that (1) the employer was aware of plaintiff's participation in protected activity; (2) that an adverse employment action was taken against the plaintiff engaged in the protected activity; and (3) that the first two elements are related causally. 29 U.S.C. § 215(a)(3) (1982). Neither Messrs. Stokes nor Wilson have made the necessary threshold showing necessary to color their claims of retaliation.

Specifically, neither plaintiff demonstrated satisfactorily that defendants had any knowledge of their contemplated legal action previous to the disciplinary actions suffered by Messrs. Stokes and Wilson. Likewise, Messrs. Stokes and Wilson were unable to establish the necessary causal connection between their pursuit of legal relief and the restrictions imposed upon them as to personal use of Admiral's limousines. Indeed, the right to take an Admiral limousine home at night was a privilege, not a right.

■ Even assuming, *arguendo*, that Messrs. Stokes and Wilson had presented a *prima facie* case of retaliation, defendants have shown legitimate, nondiscriminatory reasons for disciplining these two plaintiffs. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973); *Pedraya v. Cornell Prescription Pharmacies*, 465 F.Supp. 936, 948 (D.Co.1979). Mr. Stokes' action resulted in an extra charge to Admiral, and Mr. Wilson's behavior upset a valued customer of Admiral. Moreover, plaintiffs have failed to show that Admiral's reasons for disciplining Messrs. Stokes and Wilson were a mere pretext by demonstrating that "but for" plaintiffs' claims, Admiral would not have imposed restrictions on their use of its limousines. *See McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273, 282 n. 10, 96 S.Ct. 2574, 2580 n. 10, 49 L.Ed.2d 493 (1976).

### C. *Liquidated Damages*

■ Plaintiffs also seek an award of liquidated damages pursuant to 29 U.S.C. § 216(b) (1982) and D.C.Code § 36–215(a) (1981). The Court finds that defendants' manifest bad faith in failing to maintain proper records and pay minimum wages and overtime compensation in accordance with the FLSA and the D.C. Minimum Wage Act makes appropriate an award of "an additional equal amount as liquidated damages." 29 U.S.C. § 216(b) (1982); D.C. Code § 36–215(a) (1981); *see also Dove v. Coupe*, 759 F.2d at 175–76; 29 U.S.C. § 206(a) (1982); D.C.Code § 36–203 (1981).

Defendants' conduct in maintaining false and incomplete records was deliberate and unreasonable. Indeed, this litigation is largely the result of these ill-advised record-keeping practices. The provisions of the FLSA and the D.C. Minimum Wage Act are unambiguous, and compliance with the terms of these acts is no casual matter. *See A.H. Phillips, Inc. v. Walling*, 324 U.S. 490, 493, 65 S.Ct. 807, 808; 89 L.Ed.2d 1095 (1945); D.C.Code § 36–201 (1981).

■ In seeking to excuse their violations of the FLSA and the D.C. Minimum Wage Act, defendants note that they relied on their attorney's advice in acting as they did; their conduct reflects the industry practice; and the absence of any sanctions following a 1981 investigation of Admiral by the District of Columbia Minimum Wage Board. The Court is not impressed; defendants' justifications do not evidence a "genuine attempt to ascertain what the law requires." *Dove v. Coupe*, 759 F.2d at 175–76 (citing *Laffey v. Northwest Airlines, Inc.*, 740 F.2d 1071, 1096 (D.C.Cir. 1984), *cert. denied*, 469 U.S. 1181, 105 S.Ct. 939, 83 L.Ed.2d 951 (1985)). In short, the willfulness of defendants' violations eclipses any notion of good faith on their part. Accordingly, defendants are denied any mitigatory benefit of 29 U.S.C. § 260 (1982). *See also Hayes v. McIntosh*, 604 F.Supp. 10, 21 (N.D.Ind.1984) (Even if court found that employer acted in good faith and on reasonable grounds in violating FLSA, court still has the discretion to award liquidated damages.).

■ In addition, the Court will award plaintiffs "a reasonable attorney's fee to be paid by the defendant[s]." 29 U.S.C. § 216(b) (1982); *see also* D.C.Code § 36–215(b) (1981). The Court will assess the costs of this action against defendants, as well. D.C.Code § 36–108(b) (1981). To that end, the Court will direct plaintiffs to submit a verified application for reasonable attorney fees and the costs of this action.

### III. *Conclusion*

Defendants' violations of the FLSA and the D.C. Minimum Wage Act are plain. The underlying cause of this controversy, defendants' incomplete records, was also

the bedevilment of this Court. This opinion embodies the Court's sincere effort to decipher these records, as filtered through the testimony in assessing damages. *See Mitchell v. Riley*, 296 F.2d 614, 616 (5th Cir.1961). An appropriate order is attached.

### ORDER

This case was tried to the Court. For the reasons set forth in the accompanying opinion, it is by the Court this 27th day of February 1987,

ORDERED that judgment is granted in plaintiffs' favor based upon defendants' violations of the minimum wage and overtime compensation provisions of the Fair Labor Standards Act, 29 U.S.C. § 206(a) (1982), and the District of Columbia Minimum Wage Act, D.C.Code §§ 36–203, 211 (1981); as follows:

|  | Unpaid Minimum Wage and Overtime | Liquidated Damages | Total |
|---|---|---|---|
| Michael Caryk | $ 303.17 | $ 303.17 | $ 606.34 |
| Donald W. Cole | 121.70 | 121.70 | 243.40 |
| Jose Gomez | 313.24 | 313.24 | 626.48 |
| Nathanial Hardmon | 108.70 | 108.70 | 217.40 |
| Abdul Idelbi | 2,470.87 | 2,470.87 | 4,941.74 |
| Carlos Mascarenhas | 404.92 | 404.92 | 809.84 |
| Bhanwar Singh | 1,282.92 | 1,282.92 | 2,565.84 |
| John Stokes | 4,349.83 | 4,349.83 | 8,699.66 |
| Betty Williams | 27.44 | 27.44 | 54.88 |
| John Wilson | 1,432.21 | 1,432.21 | 2,864.42 |

29 U.S.C. § 216(b) (1982); D.C.Code § 36–215(a) (1982); it is further

ORDERED that defendants shall pay plaintiffs reasonable attorney fees and the costs of this action upon submission to the Court of a verified application for such fees and costs. 29 U.S.C. § 216(b) (1982); D.C. Code §§ 36–108(b), 215(b) (1981); it is further

ORDERED that the sum of $6,000.00 remitted by defendants to plaintiffs pursuant to the Court's order of December 13, 1985, be credited against the sums awarded herein; and it is further

ORDERED that this case is dismissed.